**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN O. BRENNAN,<br>Notice of address filed under seal,<br><br>*Plaintiff*<br><br>v.<br><br>TODD W. BLANCHE, in his official<br>capacity as Acting Attorney General,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>THE UNITED STATES DEPARTMENT OF<br>JUSTICE,<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br><br>JASON A. REDING QUIÑONES, in his<br>official capacity as U.S. Attorney for the<br>Southern District of Florida,<br>U.S. Attorney's Office<br>99 N.E. 4th Street<br>Miami, FL 33132<br><br>JOSEPH E. DIGENOVA, in his official<br>capacity as Counselor to the Attorney<br>General,<br>U.S. Attorney's Office<br>99 N.E. 4th Street<br>Miami, FL 33132<br><br>KASH P. PATEL, in his official capacity as<br>Director of the Federal Bureau of<br>Investigation,<br>935 Pennsylvania Ave, NW<br>Washington, DC 20001<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States,<br>1600 Pennsylvania Ave NW<br>Washington, DC 20500 | *Civil Action Case No.*  26-2323 |

| | |
|---|---|
| EXECUTIVE OFFICE OF THE PRESIDENT, 1600 Pennsylvania Avenue NW Washington, DC 20500<br><br>SUSAN L. WILES, in her official capacity as White House Chief of Staff, 1600 Pennsylvania Avenue NW Washington, DC 20500<br><br>JOHN L. RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency, Central Intelligence Agency Washington, DC 20505<br><br>CENTRAL INTELLIGENCE AGENCY, Washington, DC 20505<br><br>OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, 1500 Tysons McLean Dr. McLean, VA 22102<br><br>*Defendants* | |

**TABLE OF CONTENTS**

**Page**

COMPLAINT ................................................................................................................... 1

INTRODUCTION ............................................................................................................ 3

PARTIES ......................................................................................................................... 7

JURISDICTION AND VENUE .................................................................................... 10

STANDING .................................................................................................................... 11

FACTUAL BACKGROUND ......................................................................................... 12

    I.      The Justice Department has Opened Two Criminal Investigations that Target Director Brennan ..................................................................................... 12

            A.      The Grand Conspiracy Investigation ...................................................... 12

            B.      The False-Statements Investigation ........................................................ 13

    II.     The Government has Engaged, and Continues to Engage, in Unprecedented, Irregular Conduct in Connection with the Two Brennan Investigations .................................................................................................... 13

            A.      Administration Officials Call for Director Brennan's Prosecution ......... 16

            B.      The Justice Department Makes Numerous Personnel Moves to Effectuate the President's Retribution Agenda ........................................ 18

            C.      The Justice Department Engages in Haphazard Investigative Activity in Pursuit of the President's Retribution Agenda ...................... 20

            D.      Justice Department Officials Publicly Discuss Grand Jury Activity ....... 21

            E.      The Justice Department Seeks to Insulate Government Personnel from Accountability for Their Irregular Conduct .................................... 22

    III.    The Government's Unprecedented, Irregular Conduct Will Provide Strong Grounds for Challenging any Criminal Charges as Vindictive and Selective Prosecution ........................................................................................ 24

    IV.    The Court Reviewing the Vindictive and Selective Prosecution Challenges Would Engage in a Probing Analysis, as It will No Longer Afford the Traditional Presumption of Regularity to the Government ................................. 24

    V.     The Court Reviewing the Vindictive and Selective Prosecution Challenges Would Require Access to Government Materials and Communications to Assess the Prosecutors' Motivations ................................................................. 25

    VI.    Absent this Court's Intervention, There is a Serious Risk that Highly Relevant Internal Government Materials and Communications Will Not be Preserved, Which Would Prevent Director Brennan from Vindicating His Constitutional Rights ........................................................................................ 26

    VII.   Injunctive Relief is Necessary to Ensure Preservation of Relevant Government Materials and Communications and to Protect Director Brennan's Constitutional Rights ......................................................................... 34

i

# TABLE OF CONTENTS
(continued)

**Page**

COUNT 1 ............................................................................................................... 35

COUNT 2 ............................................................................................................... 37

COUNT 3 ............................................................................................................... 38

REQUEST FOR RELIEF ....................................................................................... 39

ii

## COMPLAINT

"Being perceived as the President's adversary has become risky in recent years." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d 1, 5 (D.D.C. 2026), *reconsideration denied*, 2026 WL 1224046 (D.D.C. Apr. 3, 2026). With this observation in his order quashing federal subpoenas directed at Federal Reserve Chairman Jerome Powell, Chief Judge Boasberg captured the reality that this Administration has adopted a policy of using criminal process and prosecution to punish the President's perceived adversaries. Echoing the same theme in his recent opinion finding the investigation directed against Minnesota Governor Tim Walz and other Minnesota officials to be punitive and coercive, Chief Judge Schiltz cited "the backdrop of the Trump administration's well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries." *In re Grand Jury Subpoenas Nos.* 2022R00519-A, 2022R00519-B, 2022R00519-C, 2022R00519-D, 2022R00519-E, 2022R00519-F, -- F. Supp. 3d --, 2026 WL 1783899, at *7 (D. Minn. June 22, 2026).

It is against this backdrop that former Director of the Central Intelligence Agency, John O. Brennan ("Plaintiff" or "Director Brennan"), is being vindictively singled out for investigation and prosecution. As in the above cases, the evidence of vindictiveness in this matter is overwhelming. President Trump has been condemning and calling for Director Brennan's prosecution for years. Administration officials from the Acting Attorney General to the FBI Director and the Counselor overseeing the Brennan investigations have been publicly declaring Director Brennan a criminal, not only before securing a conviction in court but even before a full investigation and an indictment. And, certain officials in the Department of Justice are engaging in demonstrably irregular prosecutorial activity in order to gin up a case that will satisfy the President's direction.

1

Given these strong indicia of vindictiveness, Director Brennan expects that he will forcefully challenge any eventual indictment as the product of an unconstitutionally vindictive and selective prosecution. In assessing that challenge, the court presiding over Director Brennan's criminal case would look to the government's internal records and communications around its investigation and charging decisions to discern the true motivations behind the government's actions. Given the government's questionable recent history with respect to its record preservation and other legal obligations, however, Director Brennan has a well-founded concern that those records and communications will not be preserved until such time as the court can review them for evidence of unconstitutional vindictiveness.

For that reason, Director Brennan, by and through his undersigned counsel, today brings this action seeking injunctive relief to enforce the preservation of those records and thereby protect his ability to defend his constitutional rights. Specifically, Director Brennan asks the court to issue an injunction to ensure that Todd W. Blanche, Acting Attorney General; the United States Department of Justice; Jason A. Reding Quiñones, the U.S. Attorney for the Southern District of Florida; Joseph E. diGenova, Counselor to the Attorney General; Donald J. Trump, President of the United States; the Executive Office of the President; Susan L. Wiles, White House Chief of Staff; John L. Ratcliffe, Director of the Central Intelligence Agency; the Central Intelligence Agency; and the Office of the Director of National Intelligence (collectively "Defendants") appropriately follow the laws of the United States and their Due Process obligations to preserve materials and communications potentially relevant to Director Brennan's legal and constitutional challenges to any future criminal charges.

For his Complaint, Director Brennan alleges as follows:

**INTRODUCTION**

1. Director Brennan is a former longtime public servant who provided more than 33 years of nonpartisan government service working for six administrations — three Republican and three Democratic — in a wide variety of national security and intelligence positions. His public-service career culminated in his term as the Director of the Central Intelligence Agency ("CIA") from March 8, 2013 to January 20, 2017.

2. While serving as Director, he participated in coordinating and issuing the January 6, 2017 Intelligence Community Assessment ("ICA"), which concluded that Russia had interfered in the 2016 presidential election in an effort to boost candidate Donald Trump's chances of winning the election. In the years since the issuance of the ICA, President Trump has often expressed his anger at Director Brennan for his role in the issuance of the ICA and for his regular public criticism of President Trump, his policies and his actions.

3. Since the beginning of his first administration in 2017, President Trump has also made more than 100 verbal or written statements that personally criticize and demonize Director Brennan. In a variety of communications — from Tweets and Truth Social posts to formal media interviews and Presidential statements — President Trump has excoriated Director Brennan as "a very bad guy," "a total low-life," a "loser" and a "political hack." At the same time, he has declared Director Brennan guilty of crimes ranging from treason to lying before Congress, and has twice posted doctored images of Director Brennan in an orange jumpsuit.

4. With his return to the White House, the President has gone beyond mere denunciation, and has actively mobilized the machinery of the criminal justice system against Director Brennan. He has directed the U.S. Department of Justice ("DOJ" or "Justice Department") to investigate and prosecute cases against Director Brennan without regard to factual or legal justification. Regrettably, some in the current Justice Department and Federal Bureau of

3

Investigation ("FBI") leadership have acceded to that direction, and are converting the Justice Department into a tool of retribution against Director Brennan and the President's other perceived adversaries.[1]

5.   This effort has resulted in the opening of two federal investigations that purport to be investigating Director Brennan for what amounts to phantom criminal conduct. The first investigation, as publicly described by senior Justice Department officials, is examining an alleged "grand conspiracy" involving Director Brennan and a number of Obama and Biden Administration officials. This fictitious "grand conspiracy" is ill-defined but is apparently based on the theoretical premise that the investigations into Russian interference in the 2016 election and the other Trump-related investigations in the succeeding years were all the product of a conspiracy to deny President Trump his civil rights. The second investigation centers on an October 21, 2025 referral from Congressman Jim Jordan, Chairman of the House Judiciary Committee, which asserts without valid support that Director Brennan made false statements about the ICA in a 2023 interview with the House Judiciary Committee.

6.   The Justice Department has undertaken separate grand jury investigations as to each of these matters. In November 2025 and January 2026, the Southern District of Florida ("SDFL") U.S. Attorney's Office issued two sets of grand jury subpoenas — one set seeking documents relating to the supposed "grand conspiracy" and the other relating to Director Brennan's alleged false statements to Congress. Then, over the weekend of April 18, 2026, a federal grand jury in Washington, D.C. issued subpoenas to a number of current and former Intelligence Community

---

[1] In detailing how some individuals in the Justice Department have succumbed to pressure from the President to selectively and vindictively target Director Brennan, there is no intent to suggest that responsibility for the resulting lapses is widely shared within the Department. To the contrary, the concerns that necessitate this complaint apply to only a small subset of officials, and the vast majority of Justice Department personnel are maintaining adherence to professional standards and carrying out their duties in the best tradition of the Justice Department.

personnel who had worked on the ICA, requiring them to testify before the grand jury in the false-statements investigation. Those subpoenas were subsequently withdrawn in favor of requests for voluntary interviews.

7. In their work on these presidentially-driven investigations, certain Justice Department officials have taken steps that clearly violate well-established norms and limitations on prosecutorial conduct. Those overreaching actions have violated Director Brennan's constitutional rights and will serve as the basis for challenges to any resulting charges, including motions to dismiss any indictment on the grounds that it is the result of selective and vindictive prosecution.

8. To fully consider those motions, the reviewing judge would need to scrutinize the motivations of the Justice Department officials who directed, oversaw, or undertook those actions to determine whether they violated Director Brennan's rights, and specifically whether they were motivated by a desire to vindictively prosecute him as an act of retribution. That scrutiny would be more probing and less deferential to the government than usual because of the Justice Department's recent record of overreaching in this and similar matters, which has negated the traditional "presumption of regularity" that generally insulates most government investigative activity from probing judicial scrutiny.

9. To perform that scrutiny after an indictment, the Court would demand access to a wide range of the government's communications and materials surrounding its investigative and prosecutive decisions. A careful examination of the prosecutors' emails, texts, instant messages, internal memoranda and the like would enable a court to determine whether their decisions were based on legitimate law enforcement concerns or on a desire to selectively and/or vindictively prosecute Director Brennan.

10. There is a very real risk, however, that some of these materials and communications will no longer exist by the time any such challenges are filed and the court hears them. This risk exists for two reasons. First, as technology changes and becomes more ephemeral, government officials are increasingly relying on communications that are not routinely preserved, even though they should be, pursuant to the government's statutory and discovery obligations. These technologies include encrypted messaging apps that can be set to auto delete, internal messaging systems such as Microsoft Teams, AI queries, and the like that are not routinely preserved.[2] Second, there is ample evidence in the public record that many in the Administration and in the Justice Department specifically are failing to observe their legal obligation to maintain such records.

11. The loss of these records will impair, perhaps fatally, the ability of the court reviewing Director Brennan's challenges to do so on the full record of contemporaneous communications and materials that is needed to divine the true intentions behind the prosecutors' decisions and actions. And Director Brennan and the Court cannot rely on pre-trial sanctions as a remedy for spoliation of records that should been preserved and produced in discovery, as it may never come to light that a particular discoverable communication ever existed in the first place and was auto-deleted or otherwise not preserved.

12. For this reason, Director Brennan brings this action asking the Court to enjoin the government to preserve any and all communications and materials that are potentially relevant to

---

[2] U.S. Dep't of Just., *Private Impact Assessment for the Email and Collaboration Services* (2024), https://perma.cc/HS8T-K2SY (announcing DOJ is using Microsoft Teams); U.S. Dep't of Just., *AI Inventory* (Jan. 30, 2026), https://perma.cc/DG59-PCFZ; *see also 2025 DOJ AI Use Case Inventory_downloadable.xlsx*, U.S. Dep't of Just., https://perma.cc/8ERX-WDY4 (spreadsheet showing more than 300 AI use cases at DOJ); Sara Mieczkowski, *How AI and Whistleblowers Are Reshaping DOJ Enforcement Strategy*, The Suarez Law Firm (July 29, 2025), https://perma.cc/RWM6-6HAN.

the consideration of Director Brennan's legal and constitutional challenges to any future criminal charges.

## PARTIES

13. Plaintiff John O. Brennan is the target of a grand jury investigation in Washington, D.C. and of investigations in two grand juries in the Southern District of Florida. He is a former director of the CIA, and he resides in the Commonwealth of Virginia.

14. Director Brennan's federal government service, which began in August 1980, spanned six Administrations—three Republican and three Democratic. In his 25-year career as a CIA officer, he served in a variety of positions of increasing responsibility, including: intelligence analyst on the Middle East and counterterrorism specialist (1980-96); political officer at the U.S. Embassy in Saudi Arabia (1982-84) while assigned to the Department of State during the Reagan Administration; briefer to President George H.W. Bush and senior Administration officials in the run-up to the First Gulf War (1990-91); daily intelligence briefer for President Bill Clinton and Vice President Al Gore (1994-95); senior U.S. intelligence official resident in Saudi Arabia (1996-99); Chief of Staff to Director of Central Intelligence George Tenet (1999-2001); and, Deputy Executive Director of the CIA (2001-03). As testament to the confidence placed in his leadership skills and national security expertise, Director Brennan was selected in 2003 to design and serve as the founding director of the Terrorist Threat Integration Center and of its successor organization the National Counterterrorism Center, which were established under President George W. Bush to address the lack of interagency collaboration within the U.S. counterterrorism community that contributed to the failure to prevent the 9/11 terrorist attacks.

15. Following his retirement from the CIA in 2005, Director Brennan returned to government service in January 2009 at the request of President Obama to serve as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor in the

Executive Office of the President. During his more than four years at the White House from January 2009 to March 2013, Director Brennan played a lead role in shaping and coordinating Obama Administration policies on counterterrorism, including the successful operation against Osama Bin Ladin and actions that dismantled Al Qa'ida's worldwide terrorist network. He also was responsible during this time for orchestrating Obama Administration policies on homeland security, pandemics, cyberattacks, and natural disasters.

16. The United States Senate confirmed Director Brennan, who has never registered as a member of any political party, as Director of the CIA in a bipartisan 63-34 vote on March 7, 2013. He was sworn into office the following day and served as CIA Director until January 20, 2017. As the CIA Director, Plaintiff was responsible for intelligence collection, analysis, covert action, counterintelligence, and liaison relationships with foreign intelligence services. He testified to Congressional Committees dozens of times as Director and was unwavering in his commitment to carry out his responsibilities in a nonpartisan, apolitical, and objective manner. While Director, Plaintiff initiated a major reorganization of the CIA — the first in over 50 years — in order to position the CIA to deal more effectively with the national security challenges of the future. The resulting new organizational structure remains in place to this day.

17. Director Brennan is the recipient of numerous awards, including the National Security Medal, the National Intelligence Distinguished Public Service Medal, the CIA Distinguished Career Intelligence Medal, the CIA Medal for Distinguished Service, and the Defense Intelligence Agency Director's Medal.

18. Defendant Todd W. Blanche is the Acting Attorney General of the United States. He leads the Department of Justice and has been in this position since April 2026. In that role, he has

8

responsibility over subordinates and record systems that would have the records to be preserved under the requested injunctive relief. He is sued in his official capacity.

19. Defendant U.S. Department of Justice is a federal agency responsible for enforcing federal criminal laws. It includes government personnel and record systems that would have the records to be preserved under the requested injunctive relief.

20. Defendant Jason A. Reding Quiñones has served as the U.S. Attorney for the Southern District of Florida since August 13, 2025. In that role, he has responsibility over subordinates and record systems that would have the records to be preserved under the requested injunctive relief. He is sued in his official capacity.

21. Defendant Joseph E. diGenova has served as Counselor to the Attorney General since April 20, 2026. He has been assigned to lead the investigations into the alleged "grand conspiracy" and into Director Brennan's alleged false statements to Congress. In that role, he has responsibility over subordinates and record systems that would have the records to be preserved under the requested injunctive relief. He is sued in his official capacity.

22. Defendant Kash P. Patel has served as the Director of the FBI since February 20, 2025. He supervises FBI agents and other personnel who are working on the Brennan investigations. In that role, he has responsibility over subordinates and record systems that would have the records to be preserved under the requested injunctive relief. He is sued in his official capacity.

23. Defendant Donald J. Trump has served as the President of the United States since January 20, 2025. He previously served as the President from January 20, 2017 to January 20, 2021. As the President, he has responsibility over Executive Branch subordinates and record systems that would have the records to be preserved under the requested injunctive relief. He is sued in his official capacity.

9

24. Defendant Executive Office of the President provides operational and management support to the President. It includes government personnel and record systems that would have the records to be preserved under the requested injunctive relief.

25. Defendant Susan L. Wiles has served as the White House Chief of Staff since January 20, 2025. In that role, she has responsibility over subordinates and record systems that would have the records to be preserved under the requested injunctive relief. She is sued in her official capacity.

26. Defendant John L. Ratcliffe has served as the current Director of the CIA since January 23, 2025. In that role, he has responsibility over subordinates and record systems that would have the records to be preserved under the requested injunctive relief. He is sued in his official capacity.

27. Defendant Central Intelligence Agency is an agency that engages in intelligence operations and analysis for the U.S. government. It includes government personnel and record systems that would have the records to be preserved under the requested injunctive relief.

28. Defendant Office of the Director of National Intelligence is an agency that provides oversight to the intelligence community. It includes government personnel and record systems that would have the records to be preserved under the requested injunctive relief.

## JURISDICTION AND VENUE

29. This Court has jurisdiction under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* This Court also has jurisdiction pursuant to 28 U.S.C. § 1361, which grants original jurisdiction to the district courts over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

10

30. Venue lies in this district under 28 U.S.C. § 1391(e)(1)(B) because a "substantial part of the events or omissions" has occurred or is occurring in the District of Columbia. A grand jury in the District of Columbia opened an investigation and issued subpoenas in relation to the allegation that Director Brennan made false statements to Congress. The government prosecutors have informed Director Brennan that any false-statements case must be filed in the District of Columbia because that is where the allegedly criminal act occurred. Most of the activities involved in the supposed "grand conspiracy" took place in the District of Columbia including the decision-making and coordination by Obama and Biden Administration officials that current Justice Department officials consider to be overt acts in furtherance of a conspiracy to deny President Trump his civil rights. Moreover, a number of the Justice Department officials making decisions about the investigations — including the Acting Attorney General, Deputy Attorney General and FBI Director — work in the District of Columbia. Finally, there is venue under 28 U.S.C. § 1391(e)(1)(A) because a defendant in the action resides in the District of Columbia, *i.e.*, the Department of Justice is located at 950 Pennsylvania Ave. NW, Washington, D.C. 20530, and the Executive Office of the President is located at 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

## STANDING

31. Director Brennan has standing because he has been, or imminently will be, injured as a result of the Defendants' conduct. *See* U.S. Const. art. III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must demonstrate an injury in fact, a sufficient causal connection between the injury and conduct by the defendant or defendants, and a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Here, Director Brennan meets those three requirements. The injury is the very real prospect that the government will fail to preserve the records he would need to challenge an indictment and

11

protect his Due Process and Equal Protection rights not to be vindictively or selectively prosecuted. That injury will be directly due to the government's action — or inaction — in regard to its preservation obligations, and the injury will be directly redressed by a judicial injunction ordering the government to preserve those records.

## FACTUAL BACKGROUND

### I. The Justice Department has Opened Two Criminal Investigations that Target Director Brennan

32. There are currently two ongoing federal grand jury investigations examining past conduct by Director Brennan. According to conversations with the supervising prosecutors, Director Brennan has been officially designated as the target — in fact, so far as undersigned counsel is aware, the only currently declared target — of both investigations. These two investigations are the product of a carefully orchestrated series of referrals claiming Director Brennan's involvement in theoretical criminal activity.

#### A. The Grand Conspiracy Investigation

33. The "grand conspiracy" investigation originated with two Intelligence Community pronouncements about Director Brennan's activities relating to the ICA — one by CIA Director John Ratcliffe on July 8, 2025 and the second by then-Director of National Intelligence Tulsi Gabbard ten days later. Both referrals were styled and publicly trumpeted as "criminal referrals," despite their failure to explain how the activities they describe constitute a crime. Notwithstanding the lack of that critical predicate, President Trump's Justice Department dutifully established a "strike force" to investigate whether Director Brennan, President Obama and numerous other Obama and Biden Administration officials conspired to deny President

12

Trump his civil rights with the series of federal investigations and prosecutions relating to the 2016 election and to President Trump's conduct in and out of office.[3]

### B. The False-Statements Investigation

34. The false-statements investigation originated with an October 21, 2025, letter from Congressman Jim Jordan, Chairman of the House Judiciary Committee, to then-Attorney General Pam Bondi.[4] In that letter, Chairman Jordan, a close ally of President Trump, refers for investigation — without any valid factual basis — an allegation that Director Brennan lied in 2023 testimony before the House Judiciary Committee when he discussed the role of the Steele Dossier (which was reportedly a batch of materials about then candidate Trump that had been assembled as opposition research by a former British intelligence officer)[5] in the production of the ICA.

## II. The Government has Engaged, and Continues to Engage, in Unprecedented, Irregular Conduct in Connection with the Two Brennan Investigations

35. Justice Department officials have engaged in a variety of inappropriate activities in their attempt to build a prosecutable case on the hollow foundation of these "criminal referrals."

---

[3] Hannah Rabinowitz, *Attorney General Bondi Orders Prosecutors to Start Grand Jury Probe into Obama Officials Over Russia Investigation*, CNN (Aug. 4, 2025), https://perma.cc/HCG8-H5KJ; Press Release, U.S. Dep't of Just., Justice Department Announces Formation of Strike Force to Assess Evidence Publicized by ODNI (July 23, 2025), https://perma.cc/ZFX6-KC5A; Ashley Oliver, David Spunt & Jake Gibson, *DOJ Launching Grand Jury Investigation into Russiagate Conspiracy Allegations: Sources*, Fox News (Aug. 4, 2025), https://perma.cc/Q5JS-XTZQ; LA Times Studios, *Straight to the Point: The Grand Conspiracy Against Trump* (YouTube, May 7, 2026), https://www.youtube.com/watch?v=h03Rtq3SwYM (https://perma.cc/7EBH-NGDC on file with Plaintiff); Hang out with Sean Hannity & Fox News, *Kash Patel Uncovers Secret FBI Documents; The De-Weaponization Plan | Hang Out with Sean Hannity*, at 38:00-39:40 (YouTube, May 5, 2026), https://www.youtube.com/watch?v=0zhi1bmlIjc (https://perma.cc/QZ2H-WYLZ on file with Plaintiff).

[4] Letter from Jim Jordan, Chairman of the H. Comm. on the Judiciary, 119th Cong., to Pamela J. Bondi, Att'y Gen., U.S. Dep't of Just. (Oct. 21, 2025), https://perma.cc/R257-56FL.

[5] *Trump-Russia Steele Dossier Source Acquitted of Lying to FBI*, BBC (Oct. 18, 2022), https://perma.cc/2P43-BQ34.

Among those activities have been the following: issuing pronouncements that evince a pre-conceived belief in Director Brennan's guilt;[6] making statements that disclose matters relating to open grand jury investigations, in apparent violation of Federal Rule of Criminal Procedure 6(e);[7] reportedly removing or sidelining career prosecutors who have balked at using the criminal process to promote the President's retribution agenda;[8] engaging in apparent forum-shopping by moving the investigations from federal district to federal district in an effort to find a sufficiently pliant United States Attorney;[9] and engaging in apparent judge-shopping.[10]

36. The scale of this manipulative activity came into focus throughout the fall of 2025, and by December 2025, it became clear that the government was seeking to circumvent standard processes and engineer assignment of the investigation and eventual prosecution of Director Brennan to the docket of a particular judge. That concern became so pronounced that undersigned counsel submitted a letter to the Chief Judge of the Southern District of Florida alerting her to the government's judge-shopping and asking that she use her supervisory

---

[6] Fox News, *DiGenova: John Brennan Should Get a Good Lawyer* (YouTube, May 18, 2018) (clip of Fox News television broadcast), https://www.youtube.com/watch?v=e7v22N2QrW8 (https://perma.cc/W5XD-GR43 on file with Plaintiff); Anna Bower & Molly Roberts, *The Grand Conspiracy's New Prosecutor May be the Case's Biggest Liability*, Lawfare (Apr. 27, 2026), https://perma.cc/3LTF-UPW2.

[7] Appendix A, at 15-16.

[8] Eric Tucker, *Key Prosecutor in John Brennan Investigation Has Been Removed From Case, AP Source Says*, AP News (Apr. 17, 2026), https://perma.cc/4362-XJE5.

[9] Appendix A, at8. As of the writing of the letter in Appendix A, it was public knowledge that the investigations targeting Director Brennan had migrated through the U.S. Attorneys' Offices for the Eastern District of Pennsylvania and the Eastern District of Virginia before finding a home in SDFL. Recent reporting indicates that FBI Director Kash Patel also shopped the investigations to the Western District of Virginia in July 2025. *See* Devlin Barrett, *How the Drive to Find a Conspiracy Against Trump Rocked the Justice Dept.*, N.Y. Times (June 8, 2026), https://perma.cc/63DZ-3KUH.

[10] Appendix A, at 10-11.

authority to ensure that any judicial assignment be done pursuant to the court's neutral and impartial processes.[11]

37. Despite the concerns laid out in that letter, the Justice Department remains seemingly committed to its plan to steer any investigation and eventual prosecution of the "grand conspiracy" case to the Fort Pierce Division of the Southern District of Florida and to the only judge in that Division — Judge Aileen Cannon. This April, the prosecution team established its headquarters in the U.S. Attorney's Office in Fort Pierce.[12] Fort Pierce is situated approximately 130 miles away from the currently open grand juries and from the investigating personnel in the FBI field office and the main SDFL U.S. Attorney's Office in Miami. It is five states away from Washington, D.C., where the vast majority of the supposed conspiratorial acts in the "grand conspiracy" took place. As such, the only apparent rationale for locating in Fort Pierce is to carry out the Justice Department's judge-shopping plan.

38. The letter to Chief Judge Altonaga lays out many of the government's irregular actions up to that time. To avoid repeating their details here, that letter is incorporated by reference and included as Appendix A, and this complaint will focus on the occurrence of like incidents since its submission on December 22, 2025.[13] The record shows that government officials have not only maintained — but have actually increased — the pace of irregular activities over the past six months. This irregularity is evident in numerous areas of the government's conduct in this matter.

---

[11] *See* Letter from Counsel for Director John O. Brennan to Chief Judge Cecilia M. Altonaga, U.S. Dist. Ct. for S.D. Fla., at 15-16 (Dec. 22, 2025), https://perma.cc/3UX5-XCMT (Appendix A).

[12] Paula Reld & Evan Perez, *Justice Department Adds Former Trump Lawyer to Investigation of Trump Critic John Brennan*, CNN (Apr. 18, 2026), https://perma.cc/Z6XV-DNK3; Evan Perez & Hannah Rabinowitz, *Inside the Justice Department's Shakeup of the John Brennan Investigation*, CNN (May 8, 2026), https://perma.cc/S58G-9MTK.

[13] *See generally* Appendix A.

### A. *Administration Officials Call for Director Brennan's Prosecution*

39. Administration officials have increased the drumbeat of explicit calls for Director Brennan's prosecution over the course of this year. For example, FBI Director Patel said, "We're going to continue to make people like Comey and Brennan and Clapper and Page and Strzok and so many others answer for what I believe are their acts of criminal conduct."[14] Then, on June 2, 2026, in his interview with Sean Hannity, Acting Attorney General Blanche identified alleged members of the "grand conspiracy" as Director Brennan, Comey, Clapper, Biden and Obama and rendered the verdict that "those folks were … certainly part of it."[15]

40. The President has also continued to opine about Director Brennan's guilt, recently reposting a Truth Social post stating that "Barack Obama and his CIA puppet John Brennan cooked up the entire Russia Hoax to steal the 2016 election and overthrow a duly elected President Trump."[16] More significantly, the President has affirmatively demanded that his Justice Department serve up a prosecution, posting a Truth Social message on May 11, 2026 expressly urging Acting Attorney General Blanche to indict Director Brennan, Hillary Clinton and President Obama,[17] and following up two weeks later with the posting of a concocted image showing Director Brennan with seven other Obama Administration officials in orange

---

[14] Katelyn Polantz, Hannah Rabinowitz & Evan Perez, *Justice Department Leans on Prosecutors in Brennan Probe as Other Trump-Foe Investigations Fizzle*, CNN (Mar. 10, 2026), https://perma.cc/HNA6-LTUF.

[15] Hang Out with Sean Hannity & Fox News, *Todd Blanche: The DOJ Room Full of Evidence Nobody Knew Existed | Hang Out with Sean Hannity*, at 26:58-27:14, 57:54-59:25 (YouTube, June 2, 2026), https://www.youtube.com/watch?v=wMZHAfSQ9vo (https://perma.cc/9X48-5XX5 on file with Plaintiff). The accusations in the interview were so pointed and unsupported that Fox News felt compelled to add an extraordinary disclaimer to that episode of *Hang Out with Sean Hannity* reminding the audience that none of the accused individuals has been charged with any crime. *See id.* at 1:38:39-1:38:59.

[16] Donald J. Trump (@realDonaldTrump), Truth Social (May 11, 2026, at 22:15 ET), https://perma.cc/D4JU-SWQV.

[17] Donald J. Trump (@realDonaldTrump), Truth Social (May 11, 2026, at 22:40 ET), https://perma.cc/T2GH-LLC2.

16

jumpsuits.[18] *See* Appendix B for a selection of President Trump's posts and statements regarding Director Brennan.

41. The President's direct demand for action against Director Brennan has been taken to heart by this Justice Department. Contrary to the tradition of insulating prosecutorial decision-making from White House influence,[19] the Justice Department leaders in this administration have shed any pretense of honoring such limitations and have unapologetically accepted direction on criminal cases from the White House. Soon after President Trump's inauguration, then-Attorney General Bondi issued a memorandum advising Department attorneys that they are to serve the "interests … of the United States" as defined by the President and to serve as "his lawyers."[20] More recently, Associate Deputy Attorney General Aakash Singh gathered the United States Attorneys on a video call and reminded them that President Trump is their "chief client."[21]

42. Acting Attorney General Blanche has made clear that this direction to consider President Trump as the "chief client" and act as "his lawyers" translates into allowing the President to dictate the Justice Department's prosecutorial decision-making. In recent comments defending the President's September 20, 2025, order to then-Attorney General Bondi to prosecute three of

---

[18] Donald J. Trump (@realDonaldTrump), Truth Social (May 24, 2026, at 08:01 ET), https://perma.cc/PN5S-24D9.

[19] Since the post-Watergate era, successive administrations have adopted and largely followed policies limiting communications between the White House and the Justice Department about criminal matters. These policies were designed to prevent both the reality and the appearance that the Department made charging and other prosecutorial decisions based on the political or personal preferences of the President and the White House. Justin Florence, *On the Importance of Limiting White House-DOJ Contacts: It's Not Just About Obstruction*, Lawfare (May 22, 2017), https://perma.cc/KS5W-NY27; Memorandum from the Attorney General to the Heads of Dep't Components, All U.S. Att'ys (May 11, 2009), https://perma.cc/W55M-M7FW (Eric Holder 2009 memo).

[20] Memorandum from the Attorney General to All Dep't Emps. (Feb. 5, 2025), https://perma.cc/3PPL-BWER.

[21] *In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump*, Bloomberg Law (Feb. 19, 2026), https://perma.cc/6VQG-3HUM.

his adversaries,[22] he contended that the American people should be "happy" that the President is directing the Justice Department's prosecution decisions.[23]

### B. The Justice Department Makes Numerous Personnel Moves to Effectuate the President's Retribution Agenda

43. Contrary to established norms, the Justice Department has made a number of extraordinary personnel moves to carry out the President's retribution campaign against Director Brennan. The most notable such move was the removal of Attorney General Bondi. It has been reported that the President fired Attorney General Bondi in part out of frustration that she had not served up the grand conspiracy prosecution that he was demanding. In an interview the day after Bondi was fired, now-Counsel to the Attorney General Joseph diGenova explained that

> [t]he President's conversation with [Attorney General Pam Bondi] yesterday coming back from the Supreme Court was not pleasant. We are told by people who were briefed on it and by other meetings that she held that day that the president was ripping mad about the fact that there was no progress on the lawfare investigation in Miami.[24]

In April, the lead career prosecutor on the Brennan investigations was removed from the case. Maria Medetis Long, a highly respected, long-tenured Justice Department veteran with deep experience in complex investigations and prosecutions, was reportedly removed shortly after telling senior DOJ leaders that "the case against [Director] Brennan was too weak to bring."[25] In AUSA Medetis Long's place, diGenova was appointed as Counselor to the Attorney General and

---

[22] Kristen Welker & Rebecca Shabad, *Trump Accidentally Posted Message Pressuring Pam Bondi to Charge his Enemies, Source Says*, NBC News (Oct. 10, 2025), https://perma.cc/LX38-A439.

[23] Laura Jarrett & Ryan J. Reilly, *Todd Blanche Says Americans Should be 'Happy' Trump is Deeply Involved in DOJ,* NBC News (Apr. 14, 2026), https://perma.cc/YYJ4-FW67.

[24] Rudolph Giuliani, *America's Mayor Live (899): Pam Bondi Out as Attorney General with Top Names Emerging to Lead DOJ*, at 1:48-2:07 (YouTube, streamed Apr. 2, 2026, at 20:00 ET), https://www.youtube.com/watch?v=5G_nT7kFLPA (https://perma.cc/F3SB-MFZ2 on file with Plaintiff).

[25] Evan Perez & Hannah Rabinowitz, *supra* note 12; Sarah N. Lynch & Daniel Klaidman, *Lead Prosecutor on Probe Into Ex-CIA Director John Brennan is Removed from Case, Sources Say*, CBS News (Apr. 17, 2026), https://perma.cc/37LC-YYMA; Eric Tucker, *supra* note 8.

given authority over all aspects of the investigation into the supposed "grand conspiracy" and Director Brennan's alleged false statements to Congress. Since that time, diGenova has been building a team to pursue the investigation.[26]

44. diGenova is a former United States Attorney and a vocal ally of President Trump. According to diGenova, the President personally appointed him to run the investigations targeting Director Brennan.[27] Despite being out of the employ of the Justice Department for many decades, diGenova has several qualities that reportedly made him particularly appealing to the President. He has staunchly supported the President with his public commentary over the years.[28] He has provided legal services in support of the President's causes, temporarily joining the President's team of lawyers dealing with the Mueller Special Counsel investigation and serving on the legal team challenging the results of the 2020 presidential election.[29] He has been a passionate advocate for the President's pet conspiracy theories, including that President Trump was the winner of the 2020 election and that the classified documents case against President Trump was manufactured by the Biden Administration.[30] Finally, diGenova has publicly pronounced Director Brennan guilty of participation in the supposed "grand conspiracy," calling

---

[26] In building that team, diGenova has recruited attorneys with demonstrated devotion to President Trump and his retribution agenda. U.S. Attorney Jason Reding Quiñones (@USAReding), X (May 19, 2026, at 20:15 ET), https://perma.cc/WZ7Y-CSUT; Erin Banco and Andrew Goudsward, *Trump 2020 Election Denier Kurt Olsen Joins Justice Department*, Reuters (June 2, 2026), https://perma.cc/N4YM-UWX5; Shawn McCreesh, Alexandra Berzon & Nick Corasaniti, *Trump's Director of Election Security is an Election Denier*, N.Y. Times (Feb. 12, 2026), https://perma.cc/483P-DP3P; *Trump-Russia: President's Legal Team Shake-Up Falters*, BBC News (Mar. 25, 2018), https://perma.cc/WR69-UGFH.

[27] Anna Bower & Molly Roberts, *supra* note 6.

[28] Associated Press, *Trump Adds New Lawyer to Russia Investigation Legal Team*, PBS News (Mar. 19, 2018), https://perma.cc/ZP79-WTLH.

[29] *Id.*; *Trump Lawyer diGenova to Lead Miami Grand Conspiracy Probe (1)*, Bloomberg Law (Apr. 18, 2026), https://perma.cc/P9BA-WX28.

[30] Anna Bower & Molly Roberts, *supra* note 6.

19

Director Brennan "evil,"[31] branding him a "traitor,"[32] and declaring that "[t]his conspiracy began with John Brennan and ends with John Brennan."[33]

   C. *The Justice Department Engages in Haphazard Investigative Activity in Pursuit of the President's Retribution Agenda*

45. Besides these personnel moves, there has been a pattern of frantic and haphazard activity as Justice Department leadership has scrambled to appease the President and his insistence on action against Director Brennan and the other retribution targets.

46. The government opened an investigation before a Miami grand jury in early November 2025, which issued subpoenas to Director Brennan and 30-odd current and former Intelligence Community officials seeking documents relating to the ICA from a date range in 2016-2017. After Director Brennan and others complied with that subpoena, DOJ prosecutors opened a second investigation before a different grand jury in Miami, which issued subpoenas in January 2026 seeking the same category of documents from 2016 all the way up to the present.

---

[31] James Hoft, *Joe diGenova on John Brennan's Lost Security Clearance: "A Glorious Day for America"*, at 1:26 (YouTube, Aug. 16, 2018) (clip of Fox News television broadcast, aired May 1, 2018, at 19:15 PM ET), https://www.youtube.com/watch?v=TzjzcAZauPc (https://perma.cc/BAE6-YVH6 on file with Plaintiff).

[32] Tamar Auber, *Joe diGenova to Hannity: John Brennan is the "Real Traitor"*, Mediaite (July 18, 2018) (clip of Fox News television broadcast, aired July 18, 2018, at 09:41 ET), https://www.mediaite.com/media/tv/joe-digenova-to-hannity-john-brennan-is-the-real-traitor/ (https://perma.cc/JDX4-P4WG on file with Plaintiff).

[33] Charlie Savage & Alan Feuer, *U.S. Installs a Trump Loyalist to Lead 'Grand Conspiracy' Case Into Trump Foes*, N.Y. Times (Apr. 18, 2026), https://perma.cc/55WV-DDBJ. When asked about those comments upon diGenova's appointment, Acting Attorney General Blanche dismissed any bias concerns saying, "I'm not sure what the conflict of interest would be because somebody has said something in the past about, about a particular matter. That doesn't create a conflict necessarily." The reporter then asked, "Well, it creates a sense of bias, doesn't it? That he's coming into the investigation with preconceived views about a target of your investigation. Isn't that a problem?" At that point, Blanche simply responded, "I just completely disagree with the premise," and gave his assurance that DiGenova will be "doing everything ethically" and "will follow the facts." The National Desk, *Acting Attorney General Blanche and FBI Director Kash Patel Hold a Press Conference*, U.S. Dep't of Just., at 25:04-27:05 (YouTube, Apr. 21, 2026), https://www.youtube.com/live/i4H6gQPcdkg (https://perma.cc/7LTP-V42R on file with Plaintiff).

20

47. Following the document subpoenas, the investigation team reached out to a number of witnesses (or their counsel) to arrange voluntary interviews. While those interviews were being arranged, the investigation team suddenly withdrew the interview requests and served several witnesses with grand jury subpoenas compelling their appearance before a grand jury in Washington, D.C. that had been empaneled to investigate the Chairman Jordan referral.[34] Within two days, however, the investigation team reversed course again, withdrawing the District of Columbia grand jury subpoenas and renewing the invitations for voluntary interviews.[35]

### D. *Justice Department Officials Publicly Discuss Grand Jury Activity*

48. While this frantic activity is ongoing, there continues to be an unprecedented amount of public discussion by DOJ officials detailing investigative activity that is ostensibly covered by grand jury secrecy under Federal Rule of Criminal Procedure 6(e). In his June 2, 2026 interview with Sean Hannity, for example, Acting Attorney General Blanche acknowledged, among other things, that "we've issued 200 grand jury subpoenas" and that a grand jury is investigating "whether or not a pattern of behavior has taken place to destroy [President Trump]."[36] When Hannity asked about "Comey," "Biden, Clapper" and "Biden," in the context of discussing the government's investigation, Blanche said, "All those folks were, were certainly part of it."[37] Earlier, on May 4, 2026, FBI Director Patel appeared on Hannity's show and engaged in a lengthy discussion of the current investigations. He confirmed the existence, scope, and general

---

[34] Daniel Klaidman & Sarah N. Lynch, *Witnesses in Criminal Probe of Ex-CIA Director Brennan Subpoenaed to Testify Before Grand Jury, Sources Say*, CBS News (Apr. 20, 2026), https://perma.cc/Z9G7-CUBZ.

[35] *Id.*; Erin Banco, Andrew Goudsward & Jonathan Landay, *FBI Questions CIA Officers Over Russia Assessment in Brennan Probe, Sources Say*, Reuters (May 12, 2026), https://perma.cc/K3YQ-ZULR.

[36] Todd Blanche interview with Sean Hannity, at 14:37-39, 38:49-39:41, *supra* note 15.

[37] *Id.* at 57:43-53.

direction of the investigations, and identified Director Brennan and the other retribution targets as falling within their scope.[38]

### E. The Justice Department Seeks to Insulate Government Personnel from Accountability for Their Irregular Conduct

49. At the same time that government personnel are accelerating their overreaching efforts against Director Brennan, the Administration is involved in a concerted effort to insulate those personnel from any accountability for their misconduct by subverting the various mechanisms for investigating or sanctioning official DOJ misconduct. It has been methodically removing or silencing those career civil servants who are responsible for internally enforcing ethics, with Attorney General Bondi firing the head of the Office of Professional Responsibility[39] and the Director of the Departmental Ethics Office[40] (who had previously given then-Deputy Attorney General Blanche the unwelcome advice that he must recuse himself from investigations involving President Trump).[41] It is working to deny state bar authorities the ability to conduct oversight of DOJ attorneys,[42] suing the D.C. Board on Professional Responsibility[43] to eliminate

---

[38] Kash Patel interview with Sean Hannity, *supra* note 3.

[39] Sam Levine, *A Top DOJ Official Trained Pam Bondi on Ethics Rules in the Department. Then He was Fired*, Guardian (Jan. 3, 2026), https://perma.cc/8JHJ-PGM3. The same day, the U.S. Pardon Attorney, who was a career civil servant, was terminated by a letter signed by Deputy Attorney General Todd Blanche. Perry Stein et al., *Trump's Justice Department Ousts Several Top Career Officials*, Washington Post (Mar. 8, 2025), https://perma.cc/5DCT-GLU2.

[40] Sam Levine, *supra* note 39; Katelyn Polantz, Evan Perez & Hannah Rabinowitz, *Exclusive: Acting AG Todd Blanche was Told Last Year to Recuse from Justice Department Matters Involving Trump*, CNN (May 14, 2026), https://perma.cc/79WB-488R.

[41] These firings have apparently had their intended effect on the internal watchdog workforce, as evidenced by recent reports that the Department of Justice Office of the Inspector General has "seemingly ignored 20 instances of possible wrongdoing by the Trump administration." Devlin Barrett, *Justice Dept. Watchdog Has Gone Silent, Lawyers for Whistle-Blower Say*, N.Y. Times (Mar. 30, 2026), https://perma.cc/UQ7V-YQBW.

[42] Currently, each Department of Justice attorney is "subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B (the McDade Amendment). *See generally In re Clark*, 678 F. Supp. 3d 112, 116-

22

its oversight of federal attorneys, and issuing a proposed regulation that will give the Attorney General the first opportunity to review any complaint against a current or former Department attorney[44] and the right to "take appropriate action to prevent the bar disciplinary authorities from interfering with the Attorney General's review of the allegations."[45] And, the President himself is using his pardon power to prevent accountability in the criminal justice system. Having pardoned numerous officials who were found guilty of or credibly charged with criminal conduct during his first administration,[46] he has now made clear that he will pardon those who serve his will in this term, stating, "I'll pardon everyone who has come within 200 feet of the Oval" and making other similar statements.[47]

50. The clear point of these combined efforts is to greatly reduce the deterrent effect of legal and ethical limitations and enforcement mechanisms on those government employees — like some of those involved in the investigations involving Director Brennan — who might be tempted to follow President Trump's orders without regard to legal or ethical limitations. And

---

18 (D.D.C. 2023) (providing overview of McDade Amendment), *aff'd*, 2024 WL 3385251 (D.C. Cir. July 12, 2024).

[43] Press Release, U.S. Dep't of Just., Justice Department Files Complaint Against D.C. Bar Disciplinary Authorities Over Their Weaponization of the Bar Disciplinary Process Against Federal Government Attorneys (May 13, 2026), https://perma.cc/CXC6-RMUH.

[44] 91 Fed. Reg. 10780 (Mar. 5, 2026) (codified at 28 C.F.R. pt. 77).

[45] *Id.*

[46] These include Rudy Giuliani, Sydney Powell, John Eastman, Boris Epshteyn, Jeffrey Clark, Mark Meadows, Paul Manafort, Roger Stone, Steve Bannon, and Michael Flynn, to name but a few. Jonathan Lemire, Eric Tucker & Jill Colvin, *Trump Pardons Ex-Strategist Steve Bannon, Dozens of Others*, AP News (Jan. 20, 2021), https://perma.cc/WCW6-XGRF; Alan Feuer & Glenn Thrush, *Trump Pardons Giuliani and Others Involved in Effort to Overturn 2020 Election*, N.Y. Times (Nov. 10, 2025), https://perma.cc/N8JQ-HTLS.

[47] Josh Dawsey, *Trump Promises Mass Pardons to Staff Before Leaving Office*, Wall Street Journal (Apr. 10, 2026), https://perma.cc/FCP6-TT6R. And, to message assurance that those followers will suffer no financial impact due to any misdeeds in his service, the Justice Department recently mounted — and was ultimately forced to abandon — an effort to establish a $1.776 billion dollar fund to make payments to those who have "suffered weaponization and lawfare." Press Release, U.S. Dep't of Just., Justice Department Announces Anti-Weaponization Fund (May 18, 2026), https://perma.cc/UM4V-D3AT.

the result thereof is a continuing crescendo in the incidence of conduct that falls far short of professional standards.

**III.    The Government's Unprecedented, Irregular Conduct Will Provide Strong Grounds for Challenging any Criminal Charges as Vindictive and Selective Prosecution**

51. This background provides a strong factual foundation for moving to dismiss any indictment that may ultimately arise from the government's current investigations as a vindictive and/or selective prosecution The above-described government conduct in this case makes it abundantly clear that the driving force behind the investigations targeting Director Brennan is the President's obsession with punishing him for his lawful conduct as CIA Director and for his constitutionally protected criticism of the President and the President's policies. That is the reason he is being singled out for investigation of concocted theories of criminal activity, and that will be the dominant reason for any criminal charges resulting from that investigation. That is also why Director Brennan will have an extremely strong basis to challenge those charges as the product of vindictive and selective prosecution.

**IV.    The Court Reviewing the Vindictive and Selective Prosecution Challenges Would Engage in a Probing Analysis, as It will No Longer Afford the Traditional Presumption of Regularity to the Government**

52. A court evaluating Director Brennan's well-founded challenges would do so without granting the deference traditionally afforded to representatives of the government under the "presumption of regularity." Traditionally, "in the absence of clear evidence to the contrary, courts presume that [government representatives] have properly discharged their official duties," *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926), and thereby refrain from closely scrutinizing the propriety of their activities. As demonstrated by the above-recited litany of irregular activities (*see supra* ¶¶ 35-37), however, there is more than "clear evidence to the contrary" in this case. As of December 22, 2025 — when undersigned counsel for Director

24

Brennan sent the attached letter to Chief Judge Altonaga in the U.S. District Court for the Southern District of Florida — the Department had already engaged in more than enough irregular conduct to lose the presumption of regularity.[48] And, the intensified pace of irregular activity since then, described *supra* ¶¶ 39-50, has only confirmed the need for the courts to carefully examine all allegations of government overreaching targeted towards Director Brennan, particularly his vindictive and selective prosecution challenges against any eventual indictment in this case.

**V.    The Court Reviewing the Vindictive and Selective Prosecution Challenges Would Require Access to Government Materials and Communications to Assess the Prosecutors' Motivations**

53. That careful examination would require the court hearing Director Brennan's challenges to review the materials and communications relating to the government's decision-making throughout the investigation and ultimate prosecution. To assess his claim that the prosecution is vindictive and selective, the court would need to evaluate the motivations of the involved government personnel, up to the President of the United States. That would be accomplished via the thorough examination of the contemporaneous statements, communications, and writings that reflect and reveal these motivations. Examples of such records include: communications from President Trump and the White House pushing for a prosecution; internal emails among DOJ officials discussing the "grand conspiracy" referrals and their search for a sufficiently pliant U.S. Attorney to handle the resulting far-fetched investigation (*see supra* note 8); prosecution memoranda and other materials reflecting assessments about the strength of any potential cases against Director Brennan; communications reflecting the reaction to AUSA Meditas Long's report that there was insufficient evidence to support the false-statements case; and records reflecting the reasons why she and others who expressed such misgivings about the Brennan

---

[48] *See* Appendix A; *supra* ¶¶ 35-36.

cases — like those prosecutors in the other districts to which the cases were initially shopped — were then pushed aside. Courts reviewing colorable vindictive and selective prosecution claims like those in this case routinely require the government to produce these records in its assessment whether the government acted vindictively or selectively in bringing a prosecution. *See*, *e.g.*, *United States v. Abrego*, 802 F. Supp. 3d 1055, 1065 (M.D. Tenn. 2025) (considering emails, internal DOJ memoranda); *United States v. Jarrett*, 2010 WL 1577670, at *4 (N.D. Ind. Apr. 20, 2010) (noting that the court did an *in camera* review of "hundreds of documents" in assessing claim of vindictive prosecution); *United States v. Fieger*, 2008 WL 205244, at *8 (E.D. Mich. Jan. 24, 2008), *as amended* (Feb. 1, 2008) (in vindictive prosecution claim, the court considered *in camera* material from the government "related to the DOJ's recusal of the three principal Detroit U.S. Attorneys" and ordered that evidence turned over to defendant); *United States v. P.H.E., Inc.*, 965 F.2d 848, 850, 853, 858 (10th Cir. 1992) (district court reviewed prosecution memoranda and letter from U.S. Attorney to Attorney General to evaluate vindictive prosecution claim implicating the First Amendment).

   VI.    **Absent this Court's Intervention, There is a Serious Risk that Highly Relevant Internal Government Materials and Communications Will Not be Preserved, Which Would Prevent Director Brennan from Vindicating His Constitutional Rights**

54. Though critical to the consideration of such claims, there is strong reason to think that many of those materials and communications will no longer exist by the time those claims are raised in this matter. Many officials in this Administration are failing to retain — or are intentionally eliminating — communications and documents that must be preserved.

55. The government has ongoing statutory and constitutional obligations to preserve evidence and records of the type that will be relevant to Director Brennan's challenges to an indictment in this matter. Many of these communications and materials — including the communications by

26

which the President is influencing the Justice Department's decision-making — are covered by the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-09, which governs the preservation of records that are created in the course of the President, Vice President, their staff and their advisers carrying out their constitutional, statutory or other responsibilities. Others are covered by the Federal Records Act ("FRA"), which requires an agency to "make and preserve records containing adequate and proper documentation" of its activities "to protect the legal … rights … of persons directly affected by the agency's activities." 44 U.S.C. § 3101.[49]

56. Those materials and communications also clearly fall within the category of evidence that the court would require the government to provide in discovery relating to Director Brennan's vindictive and selective prosecution challenges. *See supra* ¶ 53. As courts have repeatedly stated, that discovery obligation to produce evidence carries with it a corresponding obligation to preserve that evidence. "[The] duties to disclose include[] a correlative duty to preserve that evidence in the first place," *United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016); *see United States v. Harris*, 2021 WL 1546541, at *2 (D.D.C. Apr. 20, 2021) (Contreras, J), and "[t]he government has a responsibility to try in good faith to preserve material evidence." *United States v. Roberson*, 195 F. App'x 902, 903 (11th Cir. 2006); *United States v. Rolande-Gabriel*, 938 F.2d 1231, 1238 (11th Cir. 1991) (same). As the Supreme Court has explained, the

---

[49] Congress has made clear that these preservation requirements apply equally to records on non-official electronic messaging channels. In 2014, Congress amended both the PRA and the FRA to prohibit executive department personnel from using non-official electronic messaging accounts, such as on personal devices, unless they take steps to ensure the conversation is preserved. 44 U.S.C. §2911; *see Am. Hist. Ass'n v. Trump*, --- F. Supp. 3d. ----, 2026 WL 1412395, at *2 (D.D.C. May 20, 2026) (Bates, J.) (citing Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 10, 128 Stat. 2003, 2014-15); *see also United States v. Navarro*, 664 F. Supp. 3d 48, 57 (D.D.C. 2023) (the PRA applies to records such as emails or texts sent and received on personal accounts if "they arose out of [a person's] employment in the administration"), *aff'd*, 2024 WL 1364354 (D.C. Cir. Apr. 1, 2024).

government has a duty to preserve evidence that "might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984).

57. Administration officials are failing to uphold those preservation obligations in ways that are both inadvertent and advertent. First, with the evolution of technology, government officials have access to a range of communications technologies that, unlike the traditional government email system, are not amenable to standard preservation processes consistent with the FRA (discussed *infra* ¶¶ 58-59). Particularly under the current administration, government officials are increasingly relying on a variety of ephemeral methods of communication, to include social media posts, encrypted messaging apps that can be set to auto delete, internal messaging systems such as Microsoft Teams, AI queries, and the like.[50] While these ephemeral communications are fully subject to the above-listed preservation requirements, the preservation processes have not been implemented to ensure those requirements are being consistently satisfied. This is despite clear guidance from the National Archives and Research Administration warning federal agencies that "[t]he auto-delete functions of third party messaging apps may violate federal record-keeping requirements" and instructing them on the "strict requirements" in the Federal Records Act for the preservation of all such records.[51]

58. Beyond that arguably inadvertent failure to preserve, officials of this Administration have shown an advertent disdain for their preservation obligations. President Trump has repeatedly deleted social media posts that should be retained.[52] On September 20, 2025, for example, he posted a message on Truth Social directing then-Attorney General Bondi to accelerate

---

[50] *See supra* note 2.

[51] Memorandum from William Fischer, Chief Records Officer, to Fed. Records Mgmt. Contacts (May 2, 2025), https://perma.cc/TAB5-E2ZX.

[52] Bernd Debusmann Jr., *Trump Deletes Post Depicting Him as Jesus-like Figure After Backlash*, BBC News (Apr. 13, 2026), https://perma.cc/6EBF-N3EJ; Alex Nguyen, *A Non-Exhaustive List of Trump's Deleted Posts*, Mother Jones (Apr. 13, 2026), https://perma.cc/M8M7-WARP.

prosecutions against James Comey, Adam Schiff and Letitia James. Though clearly a government record to be preserved under the PRA, the President deleted the post after it became clear that it was in the public domain.[53] It has also been recently reported that President Trump sent a number of direct messages about official matters during his first administration that were never preserved.[54] And he has acted similarly with regard to hard-copy government records, reportedly once flushing some down a toilet[55] and ripping others into confetti-size pieces.[56]

59. Officials across the Executive Branch are exhibiting that same cavalier attitude about their duty to preserve records.[57] For example, during the time that Lindsey Halligan purported to serve as the U.S. Attorney in the Eastern District of Virginia, she used Signal to communicate with a journalist about a grand jury investigation under her official authority — *i.e.*, the investigation into New York Attorney General Letitia James — and set the messages to disappear after eight hours.[58] A whistleblower reportedly accused Ed Martin, formerly head of

---

[53] Kristen Welker & Rebecca Shabad, *supra* note 22; Josh Dawsey, Sadie Gurman & Aruna Viswanatha, *Inside the Justice Department Where the President Calls the Shots*, Wall Street Journal (Oct. 8, 2025), https://perma.cc/DD4C-35MH.

[54] Nate Jones, *Trump Library Says no Twitter DMs Can be Found, Despite Evidence he Sent Them*, Washington Post (June 3, 2026), https://perma.cc/95LK-AWUR.

[55] Edward Helmore, *Photos Suggest Trump Blocked Toilets with Ripped-up White House Documents*, Guardian (Aug. 8, 2022), https://perma.cc/A7VV-GP25; Mike Allen, *Exclusive Photos: Trump's Telltale Toilet*, Axios (Aug. 8, 2022), https://perma.cc/98QG-ULBK.

[56] Annie Karni, *Meet the Guys who Tape Trump's Papers Back Together*, Politico (June 10, 2018), https://perma.cc/3A7S-6HZY.

[57] *See generally A Disappearing Data Chronology*, Nat'l Sec. Archive, https://perma.cc/55SN-66EV (last visited June 5, 2026) (collecting instances of the Trump Administration changing or removing information). *See also DON'T SHRED ON ME! USAID Documents Destruction Breaks the Law, According to National Security Archive*, National Security Archive (USAID's Acting Executive Secretary inviting employees to shred or burn classified records and personnel files in March 2025); Kayla Epstein, *USAID Staff Told to Shred and Burn Classified Documents*, BBC News (Mar. 11, 2025), https://perma.cc/5M2F-JQMZ.

[58] Anna Bower, *"Anna, Lindsey Halligan Here."*, Lawfare (Oct. 20, 2025), https://perma.cc/DP74-U7XN. This was contrary to Section 9-5.004 of the federal Justice Manual, which states that "[a]ll prosecution team members should be aware of the government's obligations regarding the preservation and disclosure of electronic communications, or 'e-

the DOJ Weaponization Group, of concealing and destroying communications relating to his work on the Weaponization Working Group.[59] There was also the incident in which National Security Advisor Mike Waltz, Vice President J.D. Vance, CIA Director John Ratcliffe, Treasury Secretary Scott Bessent, DNI Director Tulsi Gabbard, Secretary of War Pete Hegseth, Secretary of State Marco Rubio, and others communicated in a Signal chat (which accidentally included a reporter from the Atlantic) about upcoming strikes against Huthi targets in Yemen with messages that indicated on their face that they would disappear at certain intervals — 1 week and 4 weeks.[60] And on one recent evening, the Associate Attorney General issued a controversial post indicating that the Department would pursue an alternative to the derailed plan to establish a fund to compensate victims of supposed "weaponization" (*see supra* note 47), but the post was deleted from his X account the next morning.[61] Finally, in a recent challenge to the Administration's mass terminations of government employees, discovery revealed that high-level

communications,' which include emails, text messages, SMS (short message service), instant messages, voice mail, pin-to-pin communications, and similar means of electronic communication. . . . Prosecution team members should preserve for later review and possible disclosure all substantive e-communications created or received by team members during the course of an investigation and prosecution . . . regardless of content"). U.S. Dep't of Just., Just. Manual § 9-5.004 (2019).

[59] Rebecca Beitsch, *Whistleblower Accuses Ed Martin of 'Concealing and Destroying' Records Related to DOJ's Weaponization Group*, Hill (Nov. 17, 2025), https://perma.cc/BG4A-UB6V; Letter from Jamie Raskin, Ranking Member, H. Comm. on the Judiciary, to Edward P. Martin, Jr., Pardon Att'y and Dir., Weaponization Working Grp., U.S. Dep't of Just. (Nov. 17, 2025), https://perma.cc/AZ83-JPKH.

[60] Josh Gerstein & Kyle Cheney, *Judge Orders Trump Administration to Preserve Signal Chats*, Politico (Mar. 27, 2025), https://perma.cc/AL4Q-NJJ5. According to reports, the National Security Advisor's team had set up at least 20 Signal group chats to discuss crises in Ukraine, China, Gaza, the broader Middle East, Africa and Europe. Dasha Burns, *Waltz's Team Set Up at Least 20 Signal Group Chats for Crises Across the World*, Politico (Apr. 2, 2025), https://perma.cc/6WKP-3K5W. Importantly, the messages about the Yemen strikes were ultimately deleted from the phone of CIA Director John Ratcliffe. Julian E. Barnes, *C.I.A. Director's Messages in Leaked Chat Were Deleted, Agency Says*, N.Y. Times (Apr. 15, 2025), https://perma.cc/BF54-6CS2.

[61] Alexander Mallin, *Top DOJ Official Deletes Post on Alternate 'Anti-weaponization' Compensation Plan*, ABC News (June 3, 2026), https://perma.cc/QNU3-RX5L.

officials in the Department of Homeland Security used Signal groups on their personal phones to communicate, and that Justice Department attorneys failed to adequately preserve those materials.[62]

60. This preservation concern is only exacerbated by the frequent personnel changes among those in the chain of command in these retribution cases. Many of those involved in different stages of Director Brennan's investigations have left or are leaving government service, to include a number of DOJ line prosecutors and supervisors, former Attorney General Bondi, and DNI Tulsi Gabbard, the source of one of the "grand conspiracy" referrals. As these personnel depart and surrender their electronic devices, there is heightened risk that information will be lost and little reason for confidence that the necessary steps will be taken to preserve it. *See* Letter Mot. at 8, *United States v. McIver*, No. 25-cr-388 (D.N.J. Dec. 23, 2025), Dkt. No. 57 ("[T]he senior official's government device had been wiped when he left government service … months after the government had supposedly instituted a preservation hold.").

61. This Administration has also demonstrated a willingness to defy record preservation laws and conventions as a matter of policy. In April 2026, the Office of Legal Counsel (OLC) at the Justice Department issued an opinion that the PRA is unconstitutional,[63] which was followed the next day with a memorandum from White House Counsel David Warrington. The Warrington

---

[62] Reply at 3, 11-14, *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-cv-3698 (N.D. Cal. June 17, 2026), Dkt. No. 421, at 3, 11-14 ("Either DOJ attorneys were willfully blind to their clients' extensive use of disappearing Signal messages in disregard of their obligation to investigate, or they knowingly participated in the concealment.").

[63] *See* Constitutionality of the Presidential Records Act, 50 Op. O.L.C. (Apr, 1, 2026) (slip op. at 1, 50), https://perma.cc/V4M7-NQFA; *see generally Am. Hist. Ass'n v. Trump*, --- F. Supp. 3d ---, 2026 WL 1412395 (D.D.C. May 20, 2026).

memo[64] significantly limited the circumstances under which text communications need to be retained.

62. Importantly, the concern about the preservation of records of value to Director Brennan is only heightened by the evidence that this Administration has shown itself willing to withhold records that cut against its interests. For example, in the prosecution of Congresswoman LaMonica McIver for interfering with federal officers during a fracas while conducting an oversight visit to an ICE facility, the prosecutors initially refused to provide any discovery.[65] When compelled to do so by the court, it was revealed that significant important discovery material had been lost, including relevant messages on the phones of federal agents at the scene that had not been collected and information on a senior official's phone that had been wiped, despite the existence of a litigation hold.[66] In the criminal prosecution of protesters in *United States v. Rabbitt* (known as the Broadview 6 case), federal prosecutors balked at the court's request to review the grand jury transcripts.[67] At first, they provided only redacted versions, and when the judge insisted on the full transcripts, they even reduced the felony charges to misdemeanors in an attempt to moot out the grand jury proceeding that had produced the felony

---

[64] Memorandum from David Alan Warrington, Assistant to the President and Counsel to the President, to Staff, Executive Office of the President (Apr. 2, 2026), https://perma.cc/R5G5-UAFW ("Warrington Memo"). *See* Mem. 3-4, *Am. Hist. Ass'n v. Trump*, No. 26-cv-1169 (D.D.C. Apr. 21, 2026), Dkt. No. 19-2. A federal judge of this Court has since enjoined implementation of the OLC opinion, *Am. Hist. Ass'n v. Trump*, --- F. Supp. 3d. ---, 2026 WL 1412395, rejecting the government's claim that it did not need to preserve text messages (or other related messaging apps such as Signal and WhatsApp). *Am. Hist. Ass'n v. Trump*, --- F. Supp. 3d. ---, 2026 WL 1412395, at *7 & n.6.

[65] Letter, *United States v. McIver*, No. 25-cr-388 (D.N.J. Sep. 10, 2025), Dkt. No. 26-2 (government stating it would not provide any discovery).

[66] Letter Mot. at 2-11, *United States v. McIver*, No. 25-cr-388 (D.N.J. Dec. 23, 2025), Dkt. No. 57.

[67] Hr'g Tr. at 20-24, *United States v. Rabbitt,* No. 25-cr-693 (N.D. Ill. May 21, 2026), Dkt. No. 187, https://perma.cc/S55U-H2GJ.

charges. When the judge finally received and reviewed unredacted copies of the transcripts, she observed, "I have never seen the types of prosecutorial behavior before a grand jury that I saw in those transcripts."[68] In a recent civil case involving the mass termination of grants awarded by the National Endowment for the Humanities, the judge faulted the government for conducting an inadequate search for relevant documents, determined that the government had provided a record that omitted clearly relevant materials, and therefore concluded that "the presumption of regularity gives way" in light of these irregularities. *Authors Guild v. Nat'l Endowment for the Humanities*, 2025 WL 3678097, at \*12 (S.D.N.Y. Dec. 18, 2025). Finally, in a recent challenge to the termination of federal probationary employees, a district court found the administrative record was a "sham" that was "scattered with innumerable references to calls, discussions, documents, and decisions that underpin, but have been excluded from, the government's narrow record."[69] As the judge colorfully explained, the experience of reviewing the government's intentionally incomplete record was as though one were "being led, blindfolded, along a carefully plotted path through a dense, unseen wood. Here and there, he may hear a rustle in the trees, feel the dark silhouette of a towering form, or intuit some other hint at the forest beyond, but never is he afforded an unfettered view of the landscape through which he passes."[70]

63. Given that record of obfuscation[71] and disregard of record preservation requirements, it is difficult to have confidence that Justice Department officials will retain the internal records that

---

[68] *Id.*

[69] Order on Cross-Mots. for Summ. J. 15-16, *Am. Fed. Of Gov. Emps. v. U.S. Off. of Personnel Mgmt.*, No. 25-cv-1780 (N.D. Cal. Sep. 12, 2025), Dkt. No. 261.

[70] *Id*.

[71] An example of this practice can be seen in the recent release of the Epstein files, where the Justice Department was less than transparent in redacting passages that were inconvenient for President Trump, Nik Popli, *Trump Administration Removes Some Redactions from Epstein Files After Outcry from Lawyers*, Time (Feb. 9, 2026), https://perma.cc/ZGW3-H6ZK ("Among the material Raskin said he encountered was a redacted passage summarizing comments

will be central to Director Brennan's effort to defend his constitutional rights in the absence of judicial intervention.

**VII.   Injunctive Relief is Necessary to Ensure Preservation of Relevant Government Materials and Communications and to Protect Director Brennan's Constitutional Rights**

64. Based on the foregoing, Director Brennan and this Court cannot rely on the government's adherence to its standard discovery obligations to ensure he will have the ability to protect his constitutional rights. That is abundantly clear from salient points about the government's conduct that clearly come through in the foregoing factual discussion — the Justice Department's consistent pattern of irregular conduct in this and other retribution cases; the repeated flouting of its discovery obligations; and the widespread disregard for the preservation requirements for government records. Under these circumstances, Director Brennan is entitled to injunctive relief, as there is every reason to believe that he will be limited in his ability to protect his constitutional rights without an injunction directing the government to preserve those records.

65. For the same reasons Director Brennan is entitled to injunctive relief, he is equally and alternatively entitled to a writ of mandamus compelling the government to preserve those records to permit the defense of his constitutional rights. Director Brennan therefore alternatively requests that the Court issue a writ of mandamus compelling the government to preserve the records enumerated below.

---

attributed to President Trump by Epstein's lawyers that contradicted Trump's public claims that he had expelled Epstein from his Mar-a-Lago club in Florida."); Rep. Davis Min, U.S. House of Representatives, *Rep. Dave Min on CNN 02/10/*2026, at 4:49-6:04 (YouTube, Feb. 10, 2026) (clip of CNN television broadcast, aired Feb. 10, 2026, at 07:40 ET), https://min.house.gov/media/press-releases/watch-rep-min-cnn-all-reeks-cover-right-now-and-we-need-release-entire-epstein (https://perma.cc/4SNG-HK2B on file with Plaintiff), and in withholding documents that alleged wrongdoing by him, Stephen Fowler, *Justice Department Withheld and Removed Some Epstein Files Related to Trump*, NPR (Feb. 24, 2026), https://perma.cc/9BZ2-9ZAU.

## COUNT 1

*Equitable Action to Enjoin Unconstitutional Conduct*

66. Director Brennan re-alleges and incorporates by reference paragraphs 1 through 65. Based on the foregoing, Director Brennan requests that this Court enjoin Defendants to preserve all records enumerated below in the Request for Relief until such time as the Court releases the injunction upon its determination that those records will no longer be needed for the protection of Director Brennan's constitutional rights in the criminal justice system.

67. It is well established that the courts have the inherent authority to provide injunctive relief in a situation where the government is taking action that may violate an individual's constitutional rights. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *Am. Hist. Ass'n v. Trump*, 2026 WL 1412395, at *13 (finding plaintiffs likely had an equitable cause of action under *Armstrong* to require that White House officials preserve records pursuant to the PRA).

68. A plaintiff seeking a permanent injunction must demonstrate a right to relief from a current or impending violation of his rights and a clear governmental duty to act to remedy that violation. In addition, a plaintiff must demonstrate four factors: (1) that the plaintiff has suffered or is likely to suffer an irreparable harm without an injunction; (2) that remedies available at law, such as monetary damages, are inadequate; (3) that the balance of the equities between the plaintiff and defendant favor an injunction; and (4) that the public interest would not be "disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1363 (D.C. Cir. 2023) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *Nat'l Pub. Radio, Inc. v. Trump,* 2026 WL 877434, at *28 (D.D.C. Mar.

35

31, 2026) (Moss, J.) ("Entry of a permanent injunction is appropriate here because Plaintiffs are likely to suffer irreparable harm—'retaliation against them in response to their exercise of their First Amendment rights'—in the absence of injunctive relief."); *see generally League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 74-75 (D.D.C. 2026) (Kollar-Kotelly, J.).

69. Director Brennan meets the elements to be entitled to injunctive relief. He will prevail on the merits because there is a clear factual predicate that his constitutional rights are being jeopardized by the government's failure to uphold its duty to preserve records. And he will suffer irreparable harm to his constitutional rights in the absence of injunctive relief, given the government's demonstrated inability and/or unwillingness to preserve relevant records and the centrality of those records to his constitutional challenge to an eventual indictment. *See supra* ¶¶ 54-63. There are no other remedies at law that can redress that harm, given that pre-trial sanctions are inadequate because the court may never know that the unpreserved communications ever existed in the first place. Next, the balance of equities tips strongly in favor of Director Brennan's interest in vindicating his constitutional rights over any claimed governmental interest in failing to satisfy well-established federal record preservation and discovery requirements. And finally, the requested injunction is squarely in the public interest, as "it is always in the public interest to prevent the violation of a party's constitutional rights." *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1206 (S.D. Fla. 2020) (internal quotation marks omitted); *see Honeyfund.com Inc. v. Governor of Florida*, 94 F.4th 1272, 1283 (11th Cir. 2024) ("[A] preliminary injunction is not contrary to the public interest because it is in the public interest to protect First Amendment rights."); *A.B.A. v. DOJ*, 783 F. Supp. 3d 236, 247-48 (D.D.C. 2025) (Cooper, J.) ("Government actions in contravention of the Constitution are 'always contrary to

36

the public interest.'" (first quotation marks omitted, remaining quotation marks ultimately quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013))).[72]

70. For these reasons, Director Brennan is entitled to injunctive relief to require the government to preserve any and all materials and communications that are potentially relevant to the consideration of Director Brennan's constitutional challenges to any future criminal charges.

## **COUNT 2**

*Writ of Mandamus Under The Mandamus Act (28 U.S.C. § 1361) And The All Writs Act (28 U.S.C. § 1651) To Protect Director Brennan's Constitutional Rights*

71. Director Brennan re-alleges and incorporates by reference paragraphs 1 through 70. Based on the foregoing, Director Brennan requests, in the alternative, that this Court issue a writ of mandamus ordering the Defendants to preserve all records enumerated below in the Request for Relief.

72. The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff" — which, in this case, is the duty the government owes to Director Brennan to preserve (and ultimately produce) all materials and communications that may be relevant to his challenges to an eventual indictment. Under the Mandamus Act, "a court may grant mandamus relief only if: (1) the plaintiff has a clear right to

---

[72] In gauging the public interest in granting this requested injunction, the Court need not worry that granting an injunction in this case will open the floodgates to similar suits from other criminal defendants seeking the courts' assistance in forcing the government to observe its preservation obligations in their cases. The exceptionally strong indication of vindictiveness in this case sets it apart from other criminal matters, as it so clearly establishes the need for the judicial scrutiny that will require access to the government's internal materials and communications at a hearing on a vindictive prosecution motion. The vast majority of defendants cannot show such clear vindictiveness, and therefore cannot demonstrate that the government will be obligated to produce those records at a post-indictment hearing. As such, they will be unable to establish a pre-indictment right to judicial enforcement of the government's obligation to preserve those records.

relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021) (citation modified). To be entitled to a writ of mandamus under the All Writs Act, this Court must find: "(1) the petitioner has no other adequate means of relief; (2) there is a clear and indisputable right to relief; and (3) the court is satisfied that mandamus is appropriate under the circumstances." *In re Trump*, 172 F.4th 44, 51-52 (D.C. Cir. 2026) (internal quotation marks omitted), *vacated*, 2026 WL 1785978 (D.C. Cir. June 22, 2026) (granting rehearing en banc).

73. Director Brennan meets the three elements to be entitled to a writ of mandamus to protect his constitutional rights. He has a clear right to relief, given the demonstrated danger that the government will fail to preserve the records needed for a court to fully consider his constitutional challenge to any future indictment. *See supra* ¶¶ 57-63. The Defendants have a clear duty to act, *i.e.*, to ensure the preservation of all such relevant records, given their obligations to preserve them for potential use in pre-trial litigation, s*ee supra* ¶ 56, and under the Federal Records Act and the Presidential Records Act, *see supra* ¶ 55. And finally, absent injunctive relief — and in light of the government's demonstrated unwillingness to self-correct its deficient records preservation practices — it is clear that Director Brennan will be left with no other adequate remedy to avoid irreparable harm to his ability to vindicate his constitutional rights.

74. For these reasons, it is necessary and appropriate for this Court, in the alternative, to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651.

## **COUNT 3**

*Injunctive Relief in Aid Of The Court's Jurisdiction Under the All Writs Act (28 U.S.C. § 1651)*

75. Director Brennan re-alleges and incorporates by reference paragraphs 1 through 74. Based on the foregoing, Director Brennan requests, in the alternative, that this Court issue an

order in aid of its jurisdiction directing Defendants to preserve all records enumerated below in the Request for Relief.

76. The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction, which includes its jurisdiction over criminal proceedings. *See* 18 U.S.C. § 3231; *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022) (finding the court had jurisdiction to issue a writ of mandamus in aid of future jurisdiction); *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015) (a court can "can issue a writ of mandamus *now* to protect the exercise of [its] appellate jurisdiction *later*"); *In re Mohammad*, 866 F.3d 473, 475 (D.C. Cir. 2017) (same); *Dascola v. City of Ann Arbor*, 22 F. Supp. 3d 736, 746 (E.D. Mich. 2014). The very purpose of the requested order in this matter is to ensure that the Court may properly carry out the responsibility to review the evidence necessary to evaluate the challenges that will be filed in the event that charges are brought against Director Brennan. It is therefore "necessary" and "appropriate" that the Court now enjoin the government to preserve those records until such time as they are required for production and review in a pre-trial hearing about whether the government acted vindictively and selectively in charging Director Brennan.

77. For these reasons, it is necessary and appropriate for this Court, in the alternative, to issue a writ of mandamus pursuant to 28 U.S.C. § 1651.

## **REQUEST FOR RELIEF**

WHEREFORE, Director Brennan respectfully requests that this Court:

(1) Issue an order requiring Defendants to preserve, and to cause their personnel and subordinates and others to preserve, any and all materials and communications that currently exist or that come into existence that are potentially relevant to the consideration of Director Brennan's legal and constitutional challenges to any future criminal charges. This requested relief encompasses but is not limited to:

a)  All records relating to any federal investigation into Director Brennan's conduct, to include the investigation into allegations that he lied in his testimony to the House of Representatives Committee on the Judiciary on May 11, 2023 and the investigation into the "grand conspiracy" being conducted out of the U.S. Attorney's Office in the Southern District of Florida;

b)  All status reports, witness statements, legal memoranda, updates, emails, messages, prosecution memoranda, communications, AI queries, calendar entries, and documents of any type relating to the two pending investigations and any possible prosecution of Director Brennan, including any assessments, analysis or evaluations of the strength or weakness of any potential criminal case against Director Brennan or others involved in the investigations;

c)  All records of communications relating to any investigation and/or possible prosecution of Director Brennan and any alleged co-conspirators, whether in person, telephonic or via any communication device or online platform, including AI platforms;

d)  All documents or communications related to meetings about any investigation involving Director Brennan and that of any alleged coconspirators, including meetings with Justice Department personnel or with any persons outside of the Justice Department, including representatives or staff of the White House and of Congress;

e)  All records of communications, public or private, by President Trump and White House employees or any government staff acting on President Trump's behalf, including all Department of Justice employees or contractors, relating to any investigation of Director Brennan or any alleged co-conspirator, including any efforts to advance the investigation or otherwise to be apprised of the status of the investigation;

40

f) All records relating to any decisions regarding personnel assigned to, removed from or conflicted from investigating or managing the investigations involving Director Brennan, including any internal emails, chats, messages, memos, meeting notices and personnel paperwork related in any manner to the assignment, removal or oversight of personnel, including U.S. Attorneys, Assistant U.S. Attorneys, supervisors, or agents involved in any manner with those investigations;

g) All records relating to any discussions or decisions regarding where any investigation or prosecution of the false-statements case or the "grand conspiracy" case will be pursued;

h) All records or communications regarding any investigation or possible prosecution of Director Brennan between Justice Department personnel and Congressman Jim Jordan and/or his staff, including any such records or communications relating to the October 21, 2025 referral to Attorney General Pam Bondi and any and all discussion about plans or suggestions for the substance or process of that referral;

i) All records or communications regarding any investigation or possible prosecution of Director Brennan or any alleged co-conspirators between Justice Department personnel and DNI Director Tulsi Gabbard and/or her staff and CIA Director John Ratcliffe and/or his staff, including any such records or communications relating to the July 2025 referrals to Attorney General Pam Bondi and any and all discussion about plans or suggestions for the substance or process of those referrals;

j) All records or communications relating to press or public statements about Director Brennan or any of alleged co-conspirators relating to any interaction between the Department of Justice and the press or members of the press about Director Brennan or the investigations involving his or his alleged co-conspirators' activities; and

41

k)  all records or communications relating to any investigation of Director Brennan or his alleged co-conspirators that were held or received by any Department of Justice personnel who have been involved in such investigation, including personnel who have stopped working on the investigation or have left employment at the Department of Justice.

(2) Issue a declaratory judgment that the government has the obligation to preserve the above-listed materials and that that obligation applies prior to indictment.

(3) Grant such other relief as the Court may deem just and proper.

Dated:  July 1, 2026

/s/ Kenneth L. Wainstein
Kenneth L. Wainstein, DC Bar # 451058
Natasha Harnwell-Davis, DC Bar # 1719228
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
KWainstein@mayerbrown.com

Dan Gelber
*Pro hac vice forthcoming*
Gelber Schachter & Greenberg, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131-1715
Telephone: (305) 728-0954
dan@gsgpa.com

Joan Silverstein
*Pro hac vice forthcoming*
Gelber Schachter & Greenberg, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131-1715
Telephone: (305) 728-0950
jsilverstein@gsgpa.com

42