**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN O. BRENNAN,

    Plaintiff

    -vs-

TODD W. BLANCHE, in his official capacity
as Acting Attorney General, et al.,

    Defendants.

Civil Action No. 26-2323

**<u>BRIEF OF LAWYERS DEFENDING AMERICAN DEMOCRACY,
AMICUS CURIAE, IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION</u>**

LAWYERS DEFENDING AMERICAN
DEMOCRACY,
Amicus Curiae, by:

| | |
|---|---|
| Jonathan Shapiro<br>*Pro hac vice forthcoming*<br>Virginia Bar #13953<br>Washington and Lee University Law School<br>Room 441<br>Denny Circle<br>Lexington, Virginia 24550<br>(703) 217-7455<br>Shapiroj@wlu.edu | James W. Conrad<br>DC Bar No. 406081<br>Conrad Law & Policy Counsel<br>800 Connecticut Ave., N.W.<br>Suite 300<br>Washington, D.C.  20006<br>(703) 405-1660<br>jamie@conradcounsel.com |

Aderson B. Francois
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
202-661-6721
aderson.francois@georgetown.edu
Counsel of Record

Dated:  July 23, 2026

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................................... ii

CORPORATE DISCLOSURE STATEMENT ................................................................................ 1

IDENTITY AND INTEREST OF AMICUS ................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................. 2

ARGUMENT .................................................................................................................................. 4

    I.    The Presumption of Regularity Is the Creature of a Prior Era ............................................4

    II.    In a Flood of Recent Criminal Prosecutions, Disturbing Government Misconduct, Rather Than Regularity, Has Been the Theme ......................................................................................7

    III.    Courts in Civil Cases Also Have Regularly Abandoned the Presumption in the Face of Department Lawyers Misrepresenting or Concealing Facts or Motivations–the Very Concern that Inspires Director Brennan's Motion .....................................................................................17

    IV.    Acting Attorney General Blanche Has Already Given the Court Reason to be Concerned...........22

    V.    The View that the Trump Administration Has Forfeited the Presumption Reflects a Bipartisan Consensus .....................................................................................................................24

CONCLUSION .............................................................................................................................. 25

CERTIFICATE OF SERVICE ...................................................................................................... 26

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abrego Garcia v. Noem*,
    777 F. Supp. 3d 501 (D. Md. 2025) .................................................................................. 20

*Am. Council of Learned Societies v. NEH*,
    No. 25-cv-3657, 2026 WL 1256545 (S.D.N.Y. May 7, 2026)........................................... 18, 19

*Authors Guild v. Nat'l Endowment for the Humanities,*
    No. 25-cv-3923, 2025 WL 3678097 (S.D.N.Y. Dec. 18, 2025)........................................... 17, 18

*Federal Education Ass'n v. Trump*,
    795 F. Supp. 3d 74 (D.D.C. 2025).................................................................................. 6, 7

*Floyd v. Department of Justice*,
    No. 26-cv-1399 (E.D. Va.) .......................................................................................... 23

*Hueso v. Soto*,
    No. 26-cv-01455, 2026 WL 539271 (D.N.J. Feb. 26, 2026) .......................................... 21, 22

*In Re: Search of One Device and Two Individuals Under Rule 41*,
    784 F. Supp. 3d 234 (D.D.C. 2025) ...............................................................................11

*In Re: Search of One Device and Two Individuals Under Rule 41*,
    No. 25-sw-82, 784 F. Supp. 3d 234 (D.D.C. May 29, 2025)............................................ 2

*In the Matter of the Search Warrant of the Real Property and Premises of Hannah Natanson*,
    No. 26-sw-00054, 2026 WL 510727 (E.D. Va. 2026) ....................................................11, 12

*Kumar v. Soto*,
    No. 26-cv-00777, 2026 WL 457398 (D.N.J. Feb. 17, 2026) .......................................... 21

*National Treasury Employees Union v. Vought*,
    774 F. Supp. 3d 1 (D.D.C. 2025), *vacated and remanded*, 149 F.4th 762 (D.C. Cir. 2025),
    *reh'g granted*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025)............................ 20

*President & Fellows of Harvard College v. Department of Homeland Security,*
    788 F. Supp. 3d 182 (D. Mass. 2025) .......................................................................... 19, 20

*Singh v. Tsoukaris*,
    No. 26-cv-1531 (D.N.J. Feb. 20, 2026), Dkt. No. 10 .................................................... 22

ii

*Trump v. IRS,*
No. 26-cv-20609, 2026 WL 2015525 (S.D. Fla. July 13, 2026)................................................ 23

*United States v. Abrego,*
No. 25-cr-00115, 2026 WL 1454303 (M.D. Tenn. May 22, 2026)...............................................11

*United States v. Abrego*,
802 F. Supp. 3d 1055 (M.D. Tenn. 2025) ............................................................................... 10

*United States v. Armstrong*,
517 U.S. 456 (1996)................................................................................................................ 5

*United States v. Beidleman*,
No. 25-270, 2025 WL 2803850 (D.D.C. Oct. 1, 2025) ........................................................... 12

*United States v. Briggs*,
810 F. Supp. 3d 994 (M.D. Ill. 2025).................................................................................... 10

*United States v. Comey*,
809 F. Supp. 3d 396 (E.D. Va. 2025) ................................................................................ 7, 8

*United States v. Dana*,
No. 25-mj-000152, 2025 WL 2803620 (D.D.C. Sept. 24, 2025)............................................ 13

*United States v. Jefferson*,
816 F. Supp. 3d 590 (E.D. Va. 2026) ............................................................................ 13, 14

*United States v. Oregon*,
No. 25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026)..................................................... 19

*United States v. Stewart,*
No. 25-mj-225, 2025 WL 2754480 (D.D.C. Sept. 29, 2025) .................................................. 13

*United States v. Sutton*,
Crim. No. 21-0598, 2024 WL 278070 (D.D.C. Jan. 25, 2024).................................................. 6

**Other Authorities**

Alan Feuer, et al., "Prosecutor Who Rejected Trump's Pressure to Charge James Is Fired," N.Y.
Times (Oct. 17, 2025), https://www.nytimes.com/2025/10/17/us/politics/trump-prosecutor-
fired-letitia-james.html............................................................................................................ 15

Aram A. Gavoor & Steven A. Platt, *In Search of the Presumption of Regularity*, 74 Fla. L. Rev.
729 (2022)............................................................................................................................ 5, 6

Cynthia Lee, Selective Prosecution in the Age of Trump: The Presumption of Regularity Problem, 104 Den. L. Rev. ___ (forthcoming 2027), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=7042598 .................................................. 17

Devon Ombres, *Does a Politically Directed Department of Justice Merit the Presumption of Regularity?*, Ctr. for Am. Progress (Sep. 15, 2025), https://www.americanprogress.org/article/does-a-politically-directed-department-of-justice-merit-the-presumption-of-regularity/ ..................................................................... 24

Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 13, 2026 at 8:40 ET) https://truthsocial.com/@realDonaldTrump/posts/115888070937502023 ............................. 16

Donald J. Trump (@realDonaldTrump), Truth Soc. (Sept. 20, 2025 at 18:44 ET), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727 [https://perma.cc/G2NY-GZTR] ..................................................................... 14

Fox News Sunday, *AG Pam Bondi Accuses District Court Judges of Playing 'Whack-a-Mole'*, at 7:01 (Apr. 6, 2025), https://www.foxnews.com/video/6371135377112 ................................... 21

Hannah Meisel, *"'Broadview 6' Trial Canceled aAs Prosecutors Acknowledge Misconduct Before Grand Jury,"* Capitol News Illinois (May 21, 2026), https://capitolnewsillinois.com/news/broadview-6-trial-canceled-as-prosecutors-acknowledge-misconduct-before-grand-jury/ ..................................................................... 9

Hannah Meisel, *"'Crock of sS—': Transcripts Show Grand Juror Dismissed for For Disagreeing With Government's Case Against 'Broadview Six,"* Capitol News Illinois (June 9, 2026), https://capitolnewsillinois.com/news/transcripts-show-grand-jurors-dismissed-for-disagreeing-with-governments-case-against-broadview-six/ ..................................................................... 9

Just Security, *About Us.* https://www.justsecurity.org/about-us/ (last visited July 17, 2026) ......... 2

Mattathias Schwartz et al., *Officials Violated More Than 50 Court Orders in New Jersey, Justice Dept. Tells Judge*, N.Y. TIMES (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/court-orders-new-jersey-immigrants.html . 21

Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L. Rev. 2431, 2432 (2018) ..................................................................... 5

Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3 (1940) .................11

Ryan Goodman et al., *The Presumption of Regularity in Trump Administration Litigation*, Just Security (4th ed. March 19, 2026), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/?utm_source=substack&utm_medium=email ......... 3

Society for the Rule of Law Inst., *About* (last visited July 20, 2026), https://societyfortheruleoflaw.org/about/ ..................................................................... 25

Society for the Rule of Law, *Leadership* (last visited July 20, 2026),
https://societyfortheruleoflaw.org/leadership/...........................................................25

Society for the Rule of Law Inst., *Our Official Letter in Opposition to Todd Blanche's Attorney General Confirmation*, Checks and Balances (June 15, 2026),
https://chkbal.substack.com/p/our-official-letter-in-opposition................................25

*Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026),
https://protectdemocracy.org/work/retaliatory-action-tracker/#cook ......................16

*Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026),
https://protectdemocracy.org/work/retaliatory-action-tracker/#democrats..............16

*Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026),
https://protectdemocracy.org/work/retaliatory-action-tracker/#hoffman................15

*Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026),
https://protectdemocracy.org/work/retaliatory-action-tracker/#lawmakers.............16

*Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026),
https://protectdemocracy.org/work/retaliatory-action-tracker/#schiff ......................17

Walter Olson, *Carousel of Contempt*, Cato Inst. (May 6, 2025),
https://www.cato.org/commentary/carousel-contempt ............................................25

**CORPORATE DISCLOSURE STATEMENT**

*Amicus Curiae* Lawyers Defending American Democracy is a nonpartisan tax-exempt 501(c)(3) corporation. Amicus is not owned by any parent corporation and no publicly held company has 10% or more ownership in LDAD.

**IDENTITY AND INTEREST OF AMICUS**

Lawyers Defending American Democracy (LDAD) files this amicus brief in support of Plaintiffs' Motion for a Preliminary Injunction. LDAD is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of democracy and the rule of law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them. It has a significant interest in this case because federal investigations and prosecutions motivated by political animus, such as the present case, have become increasingly common. Such conduct is antithetical to the impartiality and integrity of criminal law enforcement that is fundamental to the rule of law.  LDAD's core mission is preserving and strengthening the rule of law, which is the reason for its participation as amicus curiae in this case.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

"Blind deference to the government? That is no longer a thing. Trust
that had been earned over generations has been lost in weeks."[1]

For a century, courts have routinely cloaked actions of the federal government with a "presumption of regularity." In the criminal arena, application of this presumption has been justified by the great discretion afforded prosecutorial decisions – and earned by decades of honorable and ethical service by lawyers of the Justice Department (Department or DOJ).

As we demonstrate below, that trust has been lost in the second Trump Administration. In over a hundred cases across the country, courts have despaired at the government's lack of candor and its willful failure to follow court orders and the rule of law. This sudden flood of decisions rejecting application of the presumption is remarkable both for its volume and for the unprecedented degree to which it departs from past practice. Director Brennan's motion for a preliminary injunction highlights nine of these decisions. Amicus LDAD's purpose in filing this brief is to illustrate the extent to which these cases are just the tip of an iceberg. This is evidenced by the sheer number of such decisions, the rueful statements of the judges writing them, and characterizations by academics and other experts.

The single best compilation of these cases is on the website of Just Security, "an editorially independent, non-partisan, daily digital law and policy journal that elevates the discourse on national security, democracy and the rule of law." Just Security, *About Us.* *https://www.justsecurity.org/about-us/* (last visited July 17, 2026).  This publication indicates that

---

[1] The Honorable Zia M. Faruqui, United States Magistrate, in *In Re: Search of One Device and Two Individuals Under Rule 41*, No. 25-sw-82, 784 F. Supp. 3d 234, 244 n. 10 (D.D.C. May 29, 2025) (detailing some of the numerous cases—the number has dramatically increased since then—of lack of candor by the Justice Department).

as of March 19, 2026, about 14 months into the second Trump administration, there have 34

cases in which courts criticized the government for noncompliance with court orders, 90 in

which courts have expressed distrust of government information and representations, and 34 in

which courts found that the government acted arbitrarily and capriciously. Ryan Goodman et al.,

*The Presumption of Regularity in Trump Administration Litigation*, Just Security (4th ed. March

19, 2026), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-

litigation/?utm_source=substack&utm_medium=email. This does not include habeas

immigration cases, in which courts have found noncompliance in at least 740 cases, at least 150

cases in which they have declared distrust of government representations and information, and

14 cases in which the government acted arbitrarily and capriciously. *Id.* Furthermore, "[t]he three

categories above do not capture all of the judiciary's expressed concerns about the

administration's conduct; the record is even more overwhelming than the cases cataloged below.

For example, we exclude judges' concerns about Department of Justice conduct involving

prosecutorial decisions that do not fit our three categories." *Id.*

This brief discusses mainly, although not exclusively, criminal prosecutions. The post-

Watergate reforms that kept politics out of prosecutorial decision-making have given way to a

regime in which the President imposes his desire for retribution on a Department of Justice that

regards him, not the United States, as its client—and is only too eager to please him. But the

judicial retreat from the presumption of regularity spans civil as well as criminal cases, as we

document below.

Director Brennan's motion shows how government conduct in this case warrants

abandonment of the presumption. It also notes that, "in the category of cases involving

Presidential retribution targets, the presumption of regularity has been negated by the Justice

Department's recent record of irregular behavior in these matters." Mem. of P. & A. in Supp. of Pl.'s Mot. for Prelim. Inj. at 7, *Brennan v. Blanche*, No. 1:26-cv-02323 (D.D.C. July 1, 2026). This brief further elaborates on the second point, underscoring how government conduct in this case is part of larger pattern of behavior that supports the inference that the government should not receive the presumption of regularity in this case. The court will be in good company with numerous other courts if it dispenses with the presumption and instead evaluates the Department's conduct closely and carefully.

The first part of this brief provides a short overview of the presumption, its application in recent years, and the dramatic increase in cases abandoning the presumption since January 2025. The second part focuses on decisions refusing to apply the presumption of regularity in cases where the federal government is prosecuting an individual – like Director Brennan. The third part provides examples of civil cases finding the presumption inapplicable because the Department has misrepresented or failed to disclose relevant facts or motivations—cases worrisomely like what Director Brennan fears will occur in his case. The fourth part discusses reasons to be particularly concerned about defendant Blanche.  Finally, the fifth part demonstrates that dismay over the federal government's recent conduct is a bipartisan sentiment, and not another form of political "lawfare."

## ARGUMENT

I.    **There Has Been a Sharp Increase in Denials of the Presumption of Regularity Since Early 2025**

Director Brennan's motion for a preliminary injunction explains that, if he were indicted, he would argue that

> the reviewing judge would need to scrutinize the motivations of the Justice Department officials who directed, oversaw, or undertook those actions to determine whether they violated Director Brennan's rights, and specifically

4

whether they were motivated by a desire to vindictively prosecute him as an act of retribution

*Id.* at 6. There is little doubt that the government, in response, would invoke the presumption of regularity to bar discovery or even consideration of evidence regarding whether the government's prosecution of him was motivated by retribution, not the merits.

The presumption of regularity is essentially a deference doctrine; it bars scrutiny into "what happened and why" within a federal agency.  Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L. Rev. 2431, 2432 (2018). The Supreme Court has held, in response to a claim that a prosecutor committed unconstitutional selective prosecution, that "the presumption of regularity supports [the government's] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

"[T]he doctrine's operation and foundations are little understood," Note, *supra*, at 2431, and the first thorough academic treatment of the doctrine noted that it is "imprecise," "elastic," and has "shaky foundations." Aram A. Gavoor & Steven A. Platt, *In Search of the Presumption of Regularity*, 74 Fla. L. Rev. 729, 731 (2022). The article concluded that the presumption should only apply to "ministerial" "non-merit matters," in order to "reverse any shift in recent decades 'from a functional assessment of the relevant decision-making scheme to a categorical conception of executive power.'" *Id.* at 766 (quoting Note, *supra*, at 2450). It also argues that the standard for rebutting the presumption should be reduced from its "unduly high" level to a preponderance standard in order to make it consistent with the Administrative Procedure Act.  *Id.* at 763-766.

For a century at least, courts have regularly invoked the presumption to block scrutiny of the motives behind government actions, partly due to its stringent standard, but also due to the

credibility and trustworthiness that Department lawyers have evinced in their dealings with the courts and opposing counsel.[2] Since Inauguration Day 2025, however, this long historical tradition of deference has effectively vaporized.  Literally scores of judicial decisions announce that the unprecedented misconduct of Department lawyers has justified the choice of a court not to apply the presumption. This shift is powerfully articulated and substantiated in the opinion of Senior Judge Paul L. Friedman in *Federal Education Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025), a case that challenged as *ultra vires* an executive order and the associated fact sheet and guidance withdrawing collective bargaining rights from two-thirds of the federal workforce. The judge first found that the fact sheet reflected retaliatory motive and the guidance suggested that the president's actions were motivated by policy goals outside the ambit of the relevant statute. *Id.* at 89. But the judge went on:

> The Court notes that the "presumption of regularity" has become a frequent subject of litigation since January 20, 2025, the advent of the second Trump Administration. . . . The presumption of regularity finds its roots in common law and "has been recognized since the early days of the Republic." . . . Generations of presidential administrations and public officials have validated this underlying premise of the presumption of regularity: their actions writ large have raised little question that they act "in obedience to [their] duty." Over the last six months, however, courts have seen instance after instance of departures from this tradition. . . . In just six months, the President of the United States may have forfeited the right to such a presumption of regularity. As Magistrate Judge Faruqui put it: "Trust that had been earned over generations has been lost in weeks."

---

[2] Indeed, a LEXIS search for cases arising in the District Court for the District of Columbia between January 20, 2021 and January 20, 2025 (the four years preceding the current administration) disclosed that the phrase "presumption of regularity" appears in 73 cases. Of those, the courts granted the government a presumption of regularity in 54 cases. In 17 other cases, the rule was mentioned but was not of particular significance. *In just the remaining two cases*, courts refused to give the government the benefit of the rule. Notably, 12 of those cases dealt with claims of selective or vindictive prosecution, and in none of those did the court deny the government its benefit. And most significant, one such case, *United States v. Sutton*, Crim. No. 21-0598, 2024 WL 278070, at *6 (D.D.C. Jan. 25, 2024), was authored by Judge Friedman, whose scathing comments on the government's more recent conduct, and his review of cases which exemplify that conduct, are found immediately below.

*Id.* at 89-92. This short paragraph, moreover, is supported by citations to and quotations from *more than two dozen judicial decisions* in which other judges found that the presumption had been rebutted by the Department's "brazen" and "lawless conduct.

Additional and more recent decisions can be found in the Just Security compilation discussed *supra*.

Many of these decisions cited in these two sources are summarized below. Suffice it to say, however, that we unfortunately now live in an era in which the premises of the presumption of regularity on behalf of the government no longer apply.

## II.     In a Flood of Recent Criminal Prosecutions, Disturbing Government Misconduct, Rather Than Regularity, Has Been the Theme

In case after case during the second Trump administration, courts have found prosecutorial conduct so irregular and bizarre as to justify dismissal of the charges, or to order discovery supporting a vindictive prosecution claim, or to order sanctions or other relief.  Courts often did not couch their findings in terms of the presumption of regularity. There was no need, because the circumstances were so far from regular.

A prime example was the government's attempt to prosecute former FBI Director James Comey: *United States v. Comey*, 809 F. Supp. 3d 396 (E.D. Va. 2025). On the basis of a defense motion raising a claim that privileged material had been revealed to the grand jury, the court reviewed that material *in camera*. *Id.* at 402. Based on that review, the court ordered production of the entire grand jury record, something the court labeled an "extraordinary remedy," necessary in order to address "the prospect that government misconduct may have tainted" the grand jury. *Id.* at 401. The court held that "disclosure of grand jury materials under these unique circumstances is necessary to fully protect the rights of the accused." *Id.*

7

Among the acts of misconduct noted by the court was "the highly irregular and a radical departure from past DOJ practice" in allowing an agent exposed to potentially privileged information to testify before a grand jury. *Id*. at 408.  Additionally, the court identified two statements by the prosecutor to the grand jurors "that on their face appear to be fundamental misstatements of the law that could compromise the integrity of the grand jury process." *Id.* at 409. The first was the likely misleading statement that Mr. Comey did not have a right to claim the 5th Amendment at trial. *Id*. The second was a statement that suggested that the grand jury did not have to rely only on the record before them, "but could be assured that the government had more evidence–perhaps better evidence–that would be presented at trial." *Id*.

Finally, and most astounding, was the possibility that the indictment returned in court was not the indictment deliberated on by the grand jurors. This, the court said, was "uncharted territory" and "calls into question the presumption of regularity generally associated with grand jury proceedings. . . ." *Id.* at 410.

We highlight the Comey case for two reasons. First, like Director Brennan, Comey has regularly been a target of Trump's anger and his demands that he be prosecuted. Comey had filed a motion to dismiss his indictment based on selective prosecution grounds, but the court never ruled on that motion. Rather, the indictment was dismissed because it had been obtained by purported "Acting U.S. Attorney" Lindsey Halligan, who the court found was not authorized to appear before the grand jury.

Second, had Comey never sought the grand jury transcripts, or had the court refused to review the grand jury material, or not produced it for the defense (disclosing grand jury transcripts has traditionally been an extremely rare event given the secrecy surrounding grand

jury investigations), the government's misconduct would never have come to light. This argues

strongly for the relief sought by plaintiff Brennan.

Similar grand jury misconduct infected the prosecution of the "Broadview Six," a group

of anti-ICE protestors facing misdemeanor charges in federal court in Chicago.  There, the court

had ordered a review of the grand jury transcripts and was given the material with redactions.

When the full transcript was provided, it revealed significant misconduct: improper

misstatements to the grand jurors by the prosecutor; seeking an indictment after the grand jury

had initially declined to indict, with the prosecutor telling the jurors that she had not done a good

job the first time; and dismissing a grand juror who expressed his view that the case was

meritless.[3]  District Judge Perry said she was "incredibly shocked" by the earlier redactions and

added:

> I have read hundreds — if not thousands — of grand jury transcripts involving
> prosecutors who are the most junior of prosecutors to several U.S. Attorneys
> who appeared before the grand jury. I have never seen the types of prosecutorial
> behavior before a grand jury that I saw in those transcripts.[4]

As in the Comey case, the government's misconduct would not have come to light absent

a discovery request by the defense and the production of the grand jury transcript.

Other cases abound, with the full facts revealed only as a result of discovery or

evidentiary hearings. In another of the "Broadview Six" cases, a different judge dismissed, with

---

[3] *See* Hannah Meisel,  *'Crock of S—': Transcripts Show Grand Juror Dismissed For Disagreeing With Government's Case Against 'Broadview Six*, Capitol News Illinois (June 9, 2026), https://capitolnewsillinois.com/news/transcripts-show-grand-jurors-dismissed-for-disagreeing-with-governments-case-against-broadview-six/; Hannah Meisel, *'Broadview 6' Trial Canceled as Prosecutors Acknowledge Misconduct Before Grand Jury,"* Capitol News Illinois (May 21, 2026), https://capitolnewsillinois.com/news/broadview-6-trial-canceled-as-prosecutors-acknowledge-misconduct-before-grand-jury/.  The transcripts themselves are available at https://capitolnewsillinois.com/wp-content/uploads/2026/06/2026-06-09-BROADVIEW-SIX-Grand-Jury-Transcript-October-23.pdf.

[4] *'Broadview 6' Trial Canceled," supra* note 3.

prejudice, charges that had been brought against yet another anti-ICE demonstrator, noting "these are not ordinary times at the Everett McKinley Dirksen United States Courthouse," and adding "the extraordinary judicial determinations that DHS sworn declarations are unreliable, . . . the candor of its agents is open to question, and . . . sworn testimony of its CBP chief contained knowing falsehoods." *United States v. Briggs*, 810 F. Supp. 3d 994, 996, 999 (M.D. Ill. 2025).

In *United States v. Abrego*, 802 F. Supp. 3d 1055 (M.D. Tenn. 2025), the court found a realistic likelihood that the defendant was being prosecuted vindictively and selectively and ordered an evidentiary hearing on the matter. Abrego had been improperly deported, and when the court ordered his return the government charged him with human trafficking arising from a traffic stop years before that had resulted in no charges.

After the evidentiary hearing, the court found that the government had not rebutted the presumption that the prosecution was both selective and vindictive and dismissed the case. Quoting then-Attorney General Robert H. Jackson's famous warning that when "the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that [is] the greatest danger of abuse of prosecuting power . . . " the court dismissed the indictment as vindictive, stating:

> The evidence before this Court sadly reflects an abuse of prosecuting power. The Court does not reach this conclusion lightly. The objective evidence shows that, absent Abrego's successful lawsuit challenging his removal to El Salvador, the government would not have brought this prosecution….

*United States v. Abrego, 2026 WL 1454303* at \*12 (M.D. Tenn. May 22, 2026) (quoting Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3, 5 (1940)). Key to that finding was the "remarkable" public statement by Acting Attorney General Blanche that the Executive Branch began investigating Abrego only after a judge in Maryland "questioned" the Executive Branch's decision to deport him. *Id*. at \*5. Blanche's statements "directly confirm that

10

the Executive Branch reopened the criminal investigation because the Judicial Branch required the Executive Branch to facilitate Abrego's return from El Salvador." *Id.*

In *In Re: Search of One Device and Two Individuals Under Rule 41*, 784 F. Supp. 3d 234 (D.D.C. 2025), the government sought to seal forever the court's earlier order determining that probable cause did not exist to support issuance of a search warrant allowing the government to search a cell phone and take a cheek swab. Rejecting the government's "multi-step, multi-party, paranoid fever dream" explanation of why the order needed to remain sealed, its refusal to propose any redactions, and its argument that the court had to be "highly deferential," *id*. at 243-46, the court declared: "Blind deference to the government? That is no longer a thing." Reviewing the current legal landscape, the court noted that "[n]umerous career prosecutors have had to resign instead of taking actions they believed violated their oath of office, or worse, were fired for upholding that oath. . . . Judges have had to reprimand government attorneys for a lack of candor to the court, and worse, probe failures to comply with court orders." *Id.* at 244 n. 10.

In *In the Matter of the Search Warrant of the Real Property and Premises of Hannah Natanson*, 2026 WL 510727 (E.D. Va. 2026), the government sought a search warrant for the home and electronic devices of a *Washington Post* reporter.  After negotiations with the government failed, the reporter sought an order preventing the government from searching the seized devices until the court heard challenges to the search based on First Amendment rights and over-breadth. *Id.* at *3. The reporter highlighted that the application for the search warrant failed to address the Privacy Protection Act of 1980, which provides for certain procedures when the government seeks information from the press. *Id.* at *5. That failure, the magistrate judge wrote, "seriously undermined the Court's confidence in the government's disclosures"—

11

particularly as many DOJ lawyers, including lawyers from "the highest levels of the DOJ," had

"multiple opportunities" to alert the court to the PPA and failed to do so. *Id.* The court added:

> In its day-to-day workings, the Court affords government attorneys a presumption of regularity, including by assuming that federal prosecutors have satisfied their obligation to disclose controlling relevant authority….The government's conduct has disturbed that baseline posture of deference."

*Id*. at *5-6.

In *United States v. Beidleman*, No. 25-270, 2025 WL 2803850, (D.D.C. Oct. 1, 2025), the court noted "case after case involving unprecedented prosecutorial action," *id.* at *12, including charging defendants after grand juries refused to indict, charging defendants despite apparent constitutional violations, charging before proper investigation, failing to bring arrestees before a Magistrate promptly, and seeking an indictment in the local court after a federal grand jury refused to indict. *Id.* at *1.

In a similar case, the government's action in seeking to dismiss federal charges against a defendant and then proceeding with similar charges in the local court raised suspicions of court shopping. Citing the "longstanding threshold requirement from the *Principles of Federal Prosecution* that a prosecutor may commence or recommend federal prosecution only if he/she believes that the person will *more likely than not* be found guilty *beyond a reasonable doubt,"* (emphasis by court), the court expressed extraordinary frustration: *"Given that there have been an unprecedented number of cases that the U.S. Attorney dismissed in the past ten days, all of whom were detained for some period of time, *the Court is left to question if this principle still applies*." United States v. Dana*, 2025 WL 2803620 (D.D.C. Sept. 24, 2025) at *1 (second emphasis provided).

The same end run around the federal court was at issue in *United States v. Stewart,* 2025 WL 2754480 (D.D.C. Sept. 29, 2025), where the government sought an indictment in the local

court after a federal grand jury had refused to indict. The government then sought to return that

indictment to the federal court, something the court refused to accept. The court noted:

> To this judge's knowledge, what has never happened before is doing an end run
> around the federal grand jury completely. Yet that is what has happened today.
> . . . [T]his only deepens the growing mistrust of the actions of prosecutors. That
> is a sentiment which was once unthinkable, the irregular is now regular.

*Id*. at *1.

*United States v. Jefferson*, 816 F. Supp. 3d 590 (E.D. Va. 2026), concerned Lindsey

Halligan, the former insurance lawyer with no prior prosecutorial experience who was installed

as Acting U.S. Attorney after the previous U.S. Attorney was fired for declining to pursue

criminal charges against ex-FBI Director Comey. Halligan's appointment had been found to be

invalid by Chief Judge Currie, resulting in the dismissal of indictments against both Comey and

New York Attorney General Letitia James. *Id.* at 592. Nevertheless, Halligan continued to sign

indictments, including the one in *Jefferson*, identifying herself at the Acting U.S. Attorney. The

court directed her to explain her conduct,[5] and had this to say about her response:

> Ms. Halligan has not only ignored Judge Currie's rulings, she has also turned a
> blind eye to an Order from the Chief Judge of the Fourth Circuit. The Court finds
> it inconceivable that the Department of Justice, which holds a duty to faithfully
> execute the laws of the United States — even those with which it may have a
> disagreement — would repeatedly ignore court orders, while simultaneously
> prosecuting citizens for breaking the law. In the wise words of Judge J. Harvie
> Wilkinson III of the Court of Appeals for the Fourth Circuit, "[w]e yet cling to
> the hope that it is not naive to believe our good brethren in the Executive Branch
> perceive the rule of law as vital to the American ethos."

*Id.* at 596 (citation omitted).

---

[5] Her response, the court noted, which was joined by both the Attorney and the Deputy Attorney General, "contains a level of vitriol more appropriate for a cable news talk show and falls far beneath the level of advocacy expected from litigants in this Court, particularly the Department of Justice." *Id*. at 592.

13

The recent prosecution of New York Attorney General Letitia James is yet another example of the extraordinarily irregular and improper acts taken by the government in its pursuit of enemies. President Trump, in the same Truth Social post in which he demanded Mr. Comey's prosecution, had also demanded that James be prosecuted:

> Pam: I have reviewed over 30 statements and posts saying that, essentially, "same old story as last time, all talk, no action. Nothing is being done. What about Comey, Adam "Shifty" Schiff, Leticia??? They're all guilty as hell, but nothing is going to be done." . . . .They impeached me twice, and indicted me (5 times!), OVER NOTHING. JUSTICE MUST BE SERVED, NOW!!! President DJT[6]

Trump's fury at Attorney General James, and his threats to exact revenge against her, had been open, frequent and well-documented.

The path to indicting James was as winding as it was irregular, betraying the vindictiveness which motivated it. First, Trump fired the U.S. Attorney who had determined there was insufficient evidence. Two Assistant U.S. Attorneys were fired as well. The President then appointed Lindsay Halligan as Acting U.S. Attorney. Still later, two other Assistants who found no probable cause for the charges were fired.[7] The depth of this maneuvering is breathtaking.

Prosecutions aside, the past 18 months have yielded a bumper crop of federal criminal investigations with the same hallmarks of vindictiveness as those permeating the investigation of the plaintiff. The proof of vindictiveness often comes not circumstantially but directly from the mouths of top Justice Department officials, as well as the President. This pattern of conduct

---

[6] Donald J. Trump (@realDonaldTrump), Truth Soc. (Sep. 20, 2025 at 18:44 ET), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727 [https://perma.cc/G2NY-GZTR].

[7] Alan Feuer, et al., "Prosecutor Who Rejected Trump's Pressure to Charge James Is Fired," N.Y. Times (Oct. 17, 2025), https://www.nytimes.com/2025/10/17/us/politics/trump-prosecutor-fired-letitia-james.html.

14

provides additional reason to find that the current investigation is undeserving of a presumption of regularity. Those investigations are detailed in a comprehensive report issued on June 16, 2026, by the non-profit group Protect Democracy,[8] and include:

- The Department of Justice is reported to have opened an investigation of the group American Future Republic and its leader, Reid Hoffman, for money laundering concerning the group's funding of E. Jean Carroll's lawsuit against President Trump, which resulted in a lengthy trial and an award of millions of dollars. President Trump has also called upon the Department to investigate Mr. Hoffman's ties to Jeffery Epstein.[9]

- The DOJ began a criminal investigation into elected Minnesota democrats for conspiring to impede federal agents during the recent ICE surge. Before the investigation began, President Trump posted that there would be a "DAY OF RECKONING & RETRIBUTION."[10]  Acting Attorney General Blanche publicly accused several of "encouraging violence" and "terrorism." [11]

- Five members of Congress announced that they were being investigated for posting a video urging military members to disobey illegal orders–guidance drawn directly from Department of Defense policy, which provides that service members have a

---

[8] *Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy  (June 16, 2026), https://protectdemocracy.org/work/retaliatory-action-tracker/#james.
[9] *Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026), https://protectdemocracy.org/work/retaliatory-action-tracker/#hoffman.
[10] Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 13, 2026 at 8:40 ET) https://truthsocial.com/@realDonaldTrump/posts/115888070937502023).
[11] *Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026), https://protectdemocracy.org/work/retaliatory-action-tracker/#democrats.

duty to disobey clearly illegal orders. *See* Office of Gen. Counsel, U.S. Dep't of Def., *Department of Defense Law of War Manual* § 18.3.2 (rev. ed. July 2023). Additionally, Secretary of Defense Hegseth announced an investigation of Senator Mark Kelley under the Uniform Code of Military Justice for the same act. President Trump had responded to the video by suggesting the comments had been seditious and that the members were "traitors" who should be arrested, jailed or executed.[12]

- Federal Reserve Board Governor Lisa Cook is being investigated for alleged mortgage fraud. Before the investigation began, President Trump called for her resignation in a Truth Social post.[13]

- California Senator and Former Chair of the House Intelligence Committee Adam Schiff is the target of an investigation into mortgage fraud. Before the investigation began, President Trump accused him of fraud and demanded that then-Attorney Pam Bondi prosecute him, calling him "guilty as hell." He also called Senator Schiff "one of the lowest forms of scum I've ever dealt with."[14]

In sum, there appears to be no limit to the lengths that DOJ lawyers, from the Attorney General on down, are willing to take to effectuate the President's prosecutorial demands. The only "regularity" regarding this conduct is how consistently illegal, unethical and irregular it is. It

---

[12] *Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026), https://protectdemocracy.org/work/retaliatory-action-tracker/#lawmakers.

[13] *Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026), https://protectdemocracy.org/work/retaliatory-action-tracker/#cook.

[14] *Tracking Retaliatory Use of Arrests, Prosecutions, and Investigations by the Trump Administration*, Protect Democracy (June 16, 2026), https://protectdemocracy.org/work/retaliatory-action-tracker/#schiff.

would be delusional to apply the presumption of regularity in the face of such overwhelming evidence to the contrary.[15]

### III.   Courts in Civil Cases Also Have Regularly Abandoned the Presumption in the Face of Department Lawyers Misrepresenting or Concealing Facts or Motivations–the Very Concern that Inspires Director Brennan's Motion

As discussed earlier, Director Brennan is highly concerned that the Department may, even now, be failing to preserve emails, text messages and other material that reveals its motivations for prosecuting him, if it ever takes that step. That concern is realistic, given the government's conduct in numerous civil cases.

Most apposite is a recent case where DOJ repeatedly sought to exclude documents from the administrative record underlying decisions to terminate grants issued by the National Endowment for the Humanities (NEH). *Authors Guild v. Nat'l Endowment for the Humanities,* No. 25-cv-3923, 2025 WL 3678097 (S.D.N.Y. Dec. 18, 2025). The government "decline[d] to search for potentially relevant materials," "fail[ed] to explain how the record was assembled," refused to look for documents not physically located within NEH, invoked a contrived standard of "reasonable or proportionate" to limit its search efforts, and sought to limit review to NEH grant-administration channels even though the terminations had proceeded through DOGE, not NEH. *Id.* at *5-*7.

In particular, materials that the government had produced demonstrated that DOGE's review of NEH grants had been documented on a shared, collaboratively editable spreadsheet. Yet the government produced "only a later-produced, and materially different, version of the

---

[15] Relatedly, a forthcoming law review article surveys these and other Trump Administration prosecutions and calls for the outright elimination of the presumption of regularity in the selective prosecution context. Cynthia Lee, Selective Prosecution in the Age of Trump: The Presumption of Regularity Problem, 104 Den. L. Rev. ___ (forthcoming 2027), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=7042598.

spreadsheet," which it claimed was "identical" to the original even though it was demonstrably

not. *Id.* at *10. Worse, *emails that were produced "reveal[ed] that earlier spreadsheet versions*

*were not preserved, notwithstanding their central role in the review process*." *Id.* at *11

(emphasis added).

The court held "[w]here the record omits materials that were before the agency

decisionmakers, the presumption of regularity gives way." *Id.* at *12. It concluded:

> The Court reminds the parties that compliance with discovery obligations "is not optional or negotiable; rather, the integrity of our civil litigation process requires that the parties before us ... carry out their duties to maintain and disclose the relevant information in their possession in good faith." . . .It is also well-recognized that, "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." . . . The Court will not hesitate to impose sanctions should any party fail to comply with its discovery obligations or the Court's discovery directives.

*Id.* at *15 (citations omitted).

Even worse, it later emerged that three of the DOGE staffers conducting the grant review

had used Signal and other electronic applications to communicate with each other and had not

saved their communications. *Am. Council of Learned Societies v. NEH*, No. 25-cv-3657, 2026

WL 1256545, at *62-*65 (S.D.N.Y. May 7, 2026). The court declined to impose spoliation

sanctions because the plaintiffs had not shown prejudice (because *other* information amply

proved that their grants had been terminated for impermissible reasons) and because the clueless

DOGE staffers were unaware of their obligation to preserve the communications. *Id.* at *65.

In a matter as high-profile as the potential prosecution of Director Brennan, there is

vastly more reason to expect that the government will yield to the temptation to erase the tracks

of its deliberations and communications. While sanctions might be more readily awarded in this

case, after-the-fact sanctions can never restore documents that are lost or that Director Brennan

never knew existed. An injunction specifically mandating preservation of electronic communications and other documents is the only reliable option.

**Other Civil Cases Dispensing with the Presumption**

*United States v. Oregon*, No. 25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026). In one of many lawsuits against states seeking an unredacted electronic copy of the state's entire voter registration list, Oregon questioned DOJ's assurances that it would protect the privacy interests of voters and only use the data to evaluate compliance with two statutes. Faced with numerous public statements by then-Attorney General Bondi that "cast[] serious doubt as to the [DOJ's] true purposes . . . and what it intends to do with that data," the court said:

> The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds. When Plaintiff, in this case, conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary.

*Id.* at *11.

*President & Fellows of Harvard College v. Department of Homeland Security,* 788 F. Supp. 3d 182 (D. Mass. 2025) concerned the revocation of Harvard's Exchange Visitor Program. The court issued a preliminary injunction finding that the DHS's action was an unconstitutional course of retaliatory conduct. *Id.* at 186. The court refused to afford DHS the presumption of regularity for conduct "that is so unusual and therefore irregular on its face." *Id.* at 205.

*National Treasury Employees Union v. Vought* involved the Trump Administration's attempt to shut down the Consumer Financial Protection Bureau. 774 F. Supp. 3d 1 (D.D.C. 2025), *vacated and remanded*, 149 F.4th 762 (D.C. Cir. 2025), *reh'g granted*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025). The court's opinion documents in exhaustive (if not exhausting) detail the continual divergences between what government officials actually said and

did and their characterization of those actions and statements to the judge. The frustrated court

concluded:

> It is now clear to the Court that the omissions from the first declaration rendered it to be highly misleading, if not intentionally false. Defendants' initial effort to persuade the Court in their opposition that employees were hard at work on their statutory duties even after they were ordered to stand down on February 10 has been shown to be unreliable and inconsistent with the agency's own contemporaneous records, and the defendants' eleventh hour attempt to suggest immediately before the hearing that the stop work order was not really a stop work order at all was so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything.

744 F. Supp. 3d at 57. The court was only able to draw this conclusion because it had access to

an apparently complete set of email traffic generated by government personnel. This access

appears to have resulted in part from the court's first order, exactly two weeks after the first

action in the shutdown process, stating in part that the "defendants could not: delete, destroy, or

impair any data, database or other CFPB record." *Id.* at 61. A similar order in this case seems

even more necessary, given its prominence.

In *Abrego Garcia v. Noem*, Judge Xinis struggled for most of a year to undo the

government's deportation of an immigrant to El Salvador despite the presence of an order

prohibiting just that transfer. *See, e.g.*, 777 F. Supp. 3d 501, 506 (D. Md. 2025). The case got off

on a bad foot for the government when then-Attorney General Bondi fired its first counsel, Erez

Reuveni, for telling the truth to the judge.  Fox News Sunday, *AG Pam Bondi Accuses District

Court Judges of Playing 'Whack-a-Mole'*, at 7:01 (Apr. 6, 2025),

https://www.foxnews.com/video/6371135377112.  Later that year, exasperated by her inability

to get the government to explain under what legal basis Mr. Abrego Garcia had been detained,

the judge told Reuveni's successor:

> Sorry for being so sharp at nine in the morning. . . . But the reality is, this has been a process, from day one, you have taken the presumption of regularity and you've

destroyed it in my view, because I can't presume anything to be regular in this highly irregular case.

Transcript of Continued Evidentiary Hearing at 11, Abrego Garcia v. Noem, No. 25-cv-00951

(D. Md. July 14, 2025),

https://storage.courtlistener.com/recap/gov.uscourts.mdd.578815/gov.uscourts.mdd.578815.235.0

.pdf#page=11.

*Three New Jersey Immigration Cases.* After DOJ failed to comply with one of his orders,

Judge Michael Fabiarz of the District of New Jersey ordered DOJ to tally the number of times its

clients had failed to comply with an order issued by a judge in that district between December 5,

2025 and February 5, 2026. *Kumar v. Soto*, No. 26-cv-00777, 2026 WL 457398, at *1 (D.N.J.

Feb. 17, 2026). DOJ's statistics showed between 52 and 72 violations in 547 matters.[16] This

included 17 cases in which an immigrant was removed from the district despite an order

prohibiting removal and 12 occasions where bond hearings were held later than the required

date. *Id.* After DHS transferred another immigrant out of state despite an order to the contrary, a

different judge in that district (Christine O'Hearn) issued a show cause order to the government

in which she declared:

> [T]he presumption of regularity and integrity previously and routinely afforded to the Executive branch and the United States Attorney's Office has been undeniably eroded in this jurisdiction and across the country, and this Court will no longer blindly accept statements of fact from Respondents unless they are made under oath by an individual with personal knowledge.

---

[16] The New York Times characterized the list as showing 52 violations. *See* Mattathias Schwartz et al., *Officials Violated More Than 50 Court Orders in New Jersey, Justice Dept. Tells Judge*, N.Y. TIMES (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/court-orders-new-jersey-immigrants.html. A different New Jersey district judge identified 56 admitted violations and another 16 instances of "acknowledg[ed] . . . noncompliance." *See Hueso v. Soto*, No. 26-cv-01455, 2026 WL 539271, at *3 n.7 (D.N.J. Feb. 26, 2026).

*Singh v. Tsoukaris*, No. 26-cv-1531, slip op. at 2 (D.N.J. Feb. 20, 2026),

https://storage.courtlistener.com/recap/gov.uscourts.njd.591878/gov.uscourts.njd.591878.10.0.pd

f#page=2. In further support of this ruling, she noted that the local U.S. Attorney's office had

failed to notify her of this illegal transfer for six hours. *Id.* Referring to the alarming number of

violations reported to Judge Fabiarz, she added that, based on her experience, "this Court has

good reason to suspect that number is underreported." *Id.* at 3.

Yet a third judge in that district, faced with multiple transfers of an immigrant despite a

contrary order and without notice to the court, cited Judge Fabiarz's findings, quoted Judge

O'Hearn, and added:

> The undersigned will not stand idly by and allow this intentional misconduct to go
> on. It ends today. The U.S. Attorney's Office and the Department of Homeland
> Security are cautioned that further arrests and detentions under § 1225(b) that come
> before the undersigned will likely trigger the issuance of an Order to Show Cause
> and the scheduling of an in-person hearing requiring individuals with personal
> knowledge from the Office and the Department to testify under oath as to the
> specific facts and legal positions associated with the detention at issue.

*Hueso*, No. 26-cv-01455, at *3-*4.

## IV.    Acting Attorney General Blanche Has Already Given the Court Reason to be Concerned

Two recent cases have illustrated just how suspect the Justice Department's word is –

particularly the word of the Acting Attorney General.

First, in *Trump v. IRS*, No. 26-cv-20609, 2026 WL 2015525 (S.D. Fla. July 13, 2026)—

the decision that invalidated the lawsuit by President Trump against the IRS and the purported

"settlement" of that case—the court found that Mr. Blanche's testimony was "at best, misleading

and, at worst, disingenuous," *id.* at *13 n.38, and referred Mr. Blanche to New York disciplinary

authorities, *id.* at *24.

Second, in *Floyd v. Department of Justice*, No. 26-cv-1399 (E.D. Va.)—evaluating the validity of the so-called "slush fund" created by the "settlement"—the government claimed the case was mooted by Mr. Blanche's statements that plans for the fund would not go forward. The court found that his word was insufficient, but that she might find mootness if the Department filed sworn assurances within seven days.[17] The Department subsequently filed a Status Report "reconfirm[ing] that they are complying with this Court's orders and 'no payments have been made from the Anti-Weaponization Fund, and that no funding has been transferred to an account for the Anti-Weaponization Fund.'" Defendants' Status Report at 2, Floyd v. Dep't of Just., No. 26-cv-1399 (E.D. Va. June 22, 2026), https://storage.courtlistener.com/recap/gov.uscourts.vaed.596617/gov.uscourts.vaed.596617.94.0.pdf. *No sworn declaration has been presented*. Judge Brinkema has not rescinded her ruling.

Mr. Blanche heads the Justice Department. Given this "tone from the top," the Court can have little faith that, should the government succeed in obtaining an indictment against Director Brennan, it will have honored both its statutory and constitutional duties to preserve communications concerning the motivation for the prosecution. The court therefore should reject any claimed "presumption of regularity" and issue an order mandating preservation of the records identified by the Plaintiff.

---

[17] "Now, if the government truly means what it means in terms of this fund is over . . . . [I]f you get a declaration, a clear unambiguous declaration under the penalty of perjury that would have to be signed off by the Acting Attorney General and the Secretary of the Treasury." Motions Hearing Transcript at 18, Ex. 1.

23

## V.     The View that the Trump Administration Has Forfeited the Presumption Reflects a Bipartisan Consensus

The belief that the Department no longer deserves a presumption regularity is not a partisan one.

The Center for American Progress, conventionally characterized as a liberal organization,

espouses this view:

> In the first six months of the second Trump administration, the U.S. Department of Justice (DOJ) has significantly eroded the exemplary reputation it has enjoyed in the federal courts for generations. Beyond losing the goodwill of the courts, the DOJ's presumption of regularity—the standard assumption that the government has followed normal procedures and is being truthful with the courts—is now frequently called into question by the courts themselves, though not always using those specific words. The landscape has shifted from one where judges generally treated the assertions DOJ lawyers offered as, if not correct, at least made in good faith, to one where "judges openly doubt [the] government" because DOJ prosecutors are misleading them and the government is defying their orders.
> …
> It is disheartening to see the Department of Justice, once the standard bearer for American—and even global—justice, laid low by the loss of independence under the Trump administration. Simply put, the Trump/Bondi DOJ should no longer be trusted by the courts.

Devon Ombres, *Does a Politically Directed Department of Justice Merit the Presumption of*

*Regularity?*, Ctr. for Am. Progress (Sep. 15, 2025),

https://www.americanprogress.org/article/does-a-politically-directed-department-of-justice-

merit-the-presumption-of-regularity/.

    The same sentiment has been expressed, however, by the Society for the Rule of Law,

which describes itself as "a group of attorneys, law students, and other public-spirited citizens"

who would traditionally be considered conservative or libertarian. *About* (last visited July 20,

2026), https://societyfortheruleoflaw.org/about/.[18] As the Society has declared:

---

[18] The Society's leadership includes several former high-level officials in Republican administrations, including two Acting Attorneys General, a Principal Deputy Solicitor General, and a Republican-appointed former federal Court of Appeals judge. *See Leadership* (last visited July 20, 2026), https://societyfortheruleoflaw.org/leadership/.

24

> Under Mr. Blanche's leadership, first as Deputy Attorney General and then as Acting Attorney General, respect for the Department of Justice has reached historic lows. It has lost talented attorneys and agents through politically motivated terminations and forced resignations, a disturbing blow to DOJ competence that Mr. Blanche has *openly bragged* about. It has lost the confidence of the courts, which no longer reliably afford it the presumption of regularity. And it has lost the confidence of the American people, who clearly see its naked politicization.

Society for the Rule of Law Inst., *Our Official Letter in Opposition to Todd Blanche's Attorney General Confirmation*, Checks and Balances (June 15, 2026), https://chkbal.substack.com/p/our-official-letter-in-opposition (emphasis in original). So does a senior fellow with the libertarian Cato Institute:

> It took more than two centuries for federal government lawyers to build up that trust before the federal judiciary. It's taking only weeks for the second Trump administration to squander it.

Walter Olson, *Carousel of Contempt*, Cato Inst. (May 6, 2025), https://www.cato.org/commentary/carousel-contempt. Courts that decline to apply the presumption of regularity where it is not deserved will not be "weaponizing" anything.

## CONCLUSION

For the reasons set forth above, this Court should decline to apply the presumption of regularity to the Department's actions regarding Director Brennan, and should issue the injunction he seeks.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2026, I electronically filed the foregoing document with the United States District Court for the District of Columbia using the CM/ECF system, which will send notice of the filing to all counsel of record, and that I sent all counsel of record same document by email on the same date.

/s/
Aderson B. Francois
Counsel for Amicus

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
--------------------------x
ANDREW FLOYD, et al.,        :    Civil Action No.:
                             :    1:26-cv-1399
          Plaintiffs,        :
     versus                  :    Friday, June 12, 2026
                             :    Alexandria, Virginia
DEPARTMENT OF JUSTICE,       :
et al.,                      :    Pages 1-21
          Defendants.        :
--------------------------x
```

        The above-entitled motions hearing was heard before the Honorable Leonie M. Brinkema, United States District Judge. This proceeding commenced at 10:16 a.m.

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    CATHERINE CARROLL, ESQUIRE
                       POOJA BOISTURE, ESQUIRE
                       JYOTI JASRASARIA, ESQUIRE
                       AMAN GEORGE, ESQUIRE
                       ROBIN THURSTON, ESQUIRE
                       SKYE PERRYMAN, ESQUIRE
                       DEMOCRACY FORWARD FOUNDATION
                       P.O. Box 34553
                       Washington, D.C.  20043
                       (202) 448-9090

FOR THE DEFENDANTS:    ANDREW BLOCK, ESQUIRE
                       DEPARTMENT OF JUSTICE
                       OFFICE OF THE ASSOCIATE ATTORNEY GENERAL
                       950 Pennsylvania Avenue, SE
                       Washington, D.C.  20530
                       (202) 372-7565

COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       401 Courthouse Square
                       Alexandria, Virginia  22314
                       S.AustinReporting@gmail.com

        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil Action Number 1:26-cv-1399, Floyd, et al. v. Department of Justice, et al.

Will counsel please note their appearance for the record, first for the plaintiffs.

MS. CARROLL:  Good morning.  May it please the Court. Catherine Carroll from Democracy Forward on behalf of the plaintiffs.  And with me at counsel table this morning is Pooja Boisture, Jyoti Jasrasaria, Aman George, Robin Thurston, and Skye Perryman, all admitted *pro hac vice*.  And Ms. Boisture is prepared to handle the argument this morning.

THE COURT:  Good morning.

MR. BLOCK:  Good morning, Your Honor.  Andrew Block on behalf of the United States defendants.

THE COURT:  You're a brave man, Mr. Block.  You're all there by yourself.

MR. BLOCK:  Yes, Your Honor.

THE COURT:  All right.  And, frankly, you're in the hot seat, so why don't you just come right up to the lectern, and we're going to start off by asking you some questions.

Now, I'm very intrigued by what happened across the river.  I had the ability to read the transcript with Judge Leon, and you were the attorney representing the defendants in that matter, related matter, as well.

So I want to ask you, on page 14 of the transcript,

2

Stephanie Austin, RPR, CRR USDC/EDVA

Judge Leon asked you:  Why doesn't the Acting Attorney General simply rescind the May 18 order; right?

MR. BLOCK:  That's right.

THE COURT:  And you responded you didn't know the answer to that question.  That's a fair and proper answer if you don't know.

He then asked you:  Is there a reason for that?  And you said:  I don't know the reason for that.  Okay.

And then later on, you know, he asks you again on page 16:  Why not rescind it?  And you, again, said:  I don't know.

So two days ago, you know, you were asked the question several times by the District Court, and you didn't have an answer.

Do you have an answer to that question now?

MR. BLOCK:  Your Honor, I don't.  I don't have the ability to speak directly to the Attorney General and ask him that question.  I would say, though, that although --

THE COURT:  Well, let me stop you.

You obviously took back to either him or one of your supervisors --

MR. BLOCK:  Yes.

THE COURT:  -- what happened, and of course it's been in the media, and the transcript is now, I assume, available online, or at least it's now part of this record because you

3

filed it late last night.

MR. BLOCK:  Right.

THE COURT:  I cannot believe, given the significance of this case, that you didn't discuss it with somebody of a supervisory role to see whether or not you could come up with an answer.  If you're uncomfortable answering that question, I can respect that.  But you understand there's a huge gap in the record if we don't have an answer to that question.

MR. BLOCK:  Absolutely.  And to just be fully truthful, I don't have a concrete answer for that; all I would be doing would be speculating.

I mean, what I do know and what I can tell you is that the Acting Attorney General, who's the confirmed deputy, so the Number 2, and acting is the Number 1 currently, and the Associate Attorney General, who is the Number 3, have both directed that the fund not move forward.  And you'll notice that the Associate Attorney General's name is on this brief. I've signed this brief.  We've made the representations to the Court.  The Associate Attorney General signed a letter to them.

In fact, I made all of these representations to opposing counsel before they filed their motion that there was no members appointed, that there was no money transferred, that there was no claim process set up.  I represented that to them as an officer of the court before they filed their motion.  I continue to represent that to you and to the public as an

4

officer of this court through the briefs, through the filings.

So, again, I don't have an answer for why that particular paper wasn't rescinded, but I can tell you all of the things that have happened and that the fund is not moving forward.

THE COURT:  Well, the problem is -- I mean, you've argued extensively in the papers in this case, and you argued extensively in front of Judge Leon that the Court does not have jurisdiction because the issue is moot.

MR. BLOCK:  That's true.

THE COURT:  And you base that argument on what you have just said, that is the representations in court pleadings, and also there's been reference to statements that Mr. Blanche made in front of Congress --

MR. BLOCK:  That's correct.

THE COURT:  -- that the fund is not going forward.

But it's been pointed out in both the D.C. case and here that none of those statements, the oral statement before Congress or the written pleadings here, have been made under the penalty of perjury.  They're not -- from an evidentiary standpoint, they don't have sort of the imprimatur of really serious potential sanctions if that is not a truthful representation.  And the problem here is that that means the issue, in my view, is really not moot.  And I'm looking to Fourth Circuit law, and I think --

5

Mr. Glasberg, are you in the courtroom?  You got me reversed many years ago in the *Porter* case.

MR. GLASBERG:  Yes, Judge.

THE COURT:  And the *Porter* case is a case in which Mr. Glasberg sued the Department of Corrections here in Virginia because of the way in which they were housing defendants who were on capital row, as I recall, and as a result of that lawsuit, the Department of Corrections made major changes.  They changed some of the physical structure of the jails, they changed the visitation rules, they did a whole lot of changes.  And they resolved all of the issues in the complaint, but they were unwilling to sign a clear statement that they would never revert back to any of those conditions.

I thought the case was moot, and I dismissed it. Mr. Glasberg took it to the Fourth Circuit, and the Fourth Circuit reversed me in a very, very powerful decision issued in 2017 which has not been reversed or carved back, and it's based primarily on Supreme Court law.  And I'm going to read part of it to you, because I think it's absolutely on point.

So when the mootness issue was raised, that is when the initial remedy which is sought in a lawsuit has been provided, there is a well-recognized exception to the mootness doctrine holding that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  And that's

6

based on the *City of Mesquite v. Aladdin's Castle*, and it's a U.S. Supreme Court case.

So voluntary cessation of allegedly illegal conduct does not prescribe tribunal of power to hear and determine the case.  The Court went on.  The voluntary cessation exception "traces to the principle that a party should not be able to evade judicial review or to defeat a judgment by temporarily altering questionable behavior."

Accordingly, the exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure dismissal and then reinstating it immediately after."

To that end, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is" -- and here, these words are incredible -- "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."

And that is from the U.S. Supreme Court case in *Laidlaw*, so we're not even just talking about just the Fourth Circuit.

The Supreme Court has held that a defendant satisfies this heavy burden when, for example, it enters into a "unconditional and irrevocable agreement that prohibits it from returning to the challenged conduct."

And then it goes on to say:  Likewise, we have held

7

that a governmental entity's change of policy renders a challenge moot when the government entity "has not asserted its right to enforce the challenged policy at any future time." There's more language, but I think that is the most salient language.

The bottom line is, I don't have in this record the type of uncontestable evidence that this could not be repeated that the Fourth Circuit and the Supreme Court requires when there is this type of cessation activity.  And, unfortunately, there is clear evidence, I think, in the record that has been submitted in terms of the public statements and conduct of the Acting Attorney General in the sense that he's been unwilling to swear to these statements before Congress, and the multiple statements by the President, who has, on numerous occasions, talked about how important this fund is to him, how he feels it should go into effect.  His June 7th statement which was made I believe after our order even went into effect, he said:  So I personally think the weaponization fund is a great idea and so do many other republicans.  You have to get it approved.  If they get it approved, that's great; if they don't get it approved, I would be disappointed.

When the President of the United States says he's going to be disappointed if something doesn't happen, that's a pretty good indicator that there's going to be some incentive or motive to make it happen.  And I'm not going to go -- read

8

through all these other ones, except I guess I should mention the June 3rd comment when the President commented on this Court's order halting the anti-weaponization fund in which he stated "a radical left judge ruled against it, and we'll see how that all works out."

So we have in this record for my satisfaction, beyond any reasonable doubt, that there's enough evidence that we don't have the kind of absolute certainty that's required to guarantee that this fund might not rear its head in some other guise, perhaps, but that it would happen.  And so the mootness argument, in my view, doesn't go anywhere.

You've also raised ripeness.

MR. BLOCK:  Yes.

THE COURT:  And I will tell you, that might not be as strong as the mootness issue, but we've actually had a person send an application to the Court this week.  We sent it back. We're not accepting applications for the fund.  But, I mean, there are a lot of people out there who think that this fund is up and running, and there are applications there, there's evidence in the -- or representations in the complaint that there is at least one law firm that has gathered up several dozens or hundreds of planned applications.

MR. BLOCK:  And if I -- may I on that point, Your Honor?

THE COURT:  Yes.

9

MR. BLOCK:  So people may think a lot of different things, and we can't -- I can't control what everybody out there who may want to apply to the fund thinks.  What I can control is telling you that there has been no members appointed to the fund who would then have to set up a process for accepting claims.  And so while people may be lining up to talk to lawyers or trying to submit them through a process, none of those are actual submissions.  And the plaintiffs, by their own admission, have not even attempted to assert or file a claim with the fund.  They just say that they will be categorically barred, which is the definition of a future speculative injury.

And so not even -- notwithstanding the fact that the process isn't even open, and I know there's a lot of media attention and a lot of people trying to figure out how to apply to the fund, they've said that they don't even want to apply to the fund, that they can't even apply to the fund, which is just not enough to get concrete facts before this Court to give rise to justiciability.

THE COURT:  Well, I don't agree with you on that.  I think there's enough here in terms of ripeness to let it go forward.

And there's also, in my view -- we have five different defendants.  We have two individuals, and then we have three entity-type of defendants, the City of New Haven, and then we have Common Cause and the abortion agency.

10

All of them have slightly different bases for standing.  I think some may be stronger than others, but I'm satisfied that we have enough for standing for several of these plaintiffs that also that jurisdictional issue does not give the Court concern.

So this is before the Court on the plaintiffs' motion for a temporary restraining order or a preliminary injunction.  And we allowed -- and just so it's clear what I did with my order two weeks ago, the plaintiffs wanted immediate briefing, and you all wanted more time to brief the issues.  But the concern was that this fund might move forward in that time frame, and so what I did was grant your request.  But to get that extra time, I wanted to make sure everything stayed in place, and that's why --

MR. BLOCK:  And we had offered that to the plaintiffs, and they rejected that offer, just to be clear.

THE COURT:  All right.  Well, that's great, but it didn't happen, so I did the order.

So now I don't know why we would do another TRO.  I think we're at the preliminary injunction stage, unless you have an objection to going that route.

MR. BLOCK:  I don't think so.  I mean, I think the standards are quite the same.

THE COURT:  The standards are basically the same.

So what we have then is we are looking at the *Winter*

11

factors.  Straightforward.  This case is no different from any other case requesting early injunctive relief.

The first issue is, you know, whether there's a likelihood of success on the merits.  And I think there's clearly -- and your main argument has been that the Court doesn't have jurisdiction under either the concepts of standing, ripeness or mootness.  And I don't think any of those three are a problem at this level, that there's enough in this record that certainly establishes that this Court does have jurisdiction, that there is a live, justiciable issue before the Court, and I think that is quite well satisfied.

What I'm intrigued about is the balancing of the equities.  Now, the plaintiffs have argued that they would suffer, and not just they, but if you look at the public as a whole, there's really irreparable injury that could occur if an injunction is not in place.

What I want to ask you is, what injury does either the Department of the Treasury or the Department of Justice -- those are our defendants -- what injury do they face if the Court issues a preliminary injunction at this point?

MR. BLOCK:  Well, Your Honor, I mean, I think there's plenty of case law -- and I'm forgetting the names off the top of my head, and we can -- I think some of this may be in our briefing, but we can certainly follow up later today or next week with some case names.  But injunctions of the executive

12

branch and their ability to conduct lawful basis are presumptively harmful.  And so that would be the first thing.  But --

THE COURT:  You think this is lawful business?  There's a serious issue -- and, you know, we haven't talked about, and I don't really want to get involved in the Florida litigation, but the only reason this fund exists is because it's part of a settlement, which is now seriously under scrutiny by the Court as to whether that is a legitimate lawsuit that resulted in that settlement.

MR. BLOCK:  Your Honor, again, it's our position that there is not -- and I understand that the Court disagrees, but the government's position is that there is no threat of imminent harm because there are so many future contingent actions that would have to happen.  And not only that, there are the statements of the leaders of the Department of Justice saying that the fund is not moving forward.

So it's hard for me to speculate as to what exactly the harm is, but the harm of being restrained on hypotheticals that there's an injunction in place on the executive branch, on cabinet-level officials to not -- or to not do certain things based on a very kind of loose factual record that is very premature is -- is -- has been recognized to be harm.

And I would also point the Court to the *Norton* case, which we cited I think briefly in the Administrative Procedures

13

Act.  It's a Fourth Circuit case talking about what constitutes final agency action.  Almost all of the plaintiffs -- almost all of their claims in this case arise under the APA, and for a Court to have jurisdiction to review anything under the APA, there must be final agency action, which is, again, to include the whole or part of an agency rule, order, license, sanction, relief or the equivalent denial thereof or a failure to act. We're nowhere close to that.  We're nowhere close to that in this case.

And so, again, it's just -- it's -- there's too many what-ifs out there in the future to support the harm and the injury that they are alleging.

THE COURT:  All right.  I'll hear from plaintiffs. And you don't need to repeat the argument -- any arguments on jurisdiction or on the first element of the *Winter* factors. But just for the record, if you'll highlight the irreparable harm if the Court does not grant injunctive relief.

MS. BOISTURE:  As to plaintiffs or as to defendants?

THE COURT:  As to plaintiffs.

MS. BOISTURE:  Yes, Your Honor.

There is irreparable harm that each of our plaintiffs face because of the claims that they have brought here.  So, for example, a couple of our plaintiffs bring both First Amendment injuries and equal protection injuries.  Those are immediately irreparable harm under the case law.  Other

14

plaintiffs bring claims of immediate harm of violence. Now, those are not just based on a series of hypotheses, as defendants' counsel has represented, those are well-reasoned harms based on what the President has already done and the harm that they're seeing.

So, for example, for plaintiff NAF, they have -- and their members, they have already seen an increase and surge of violence because the President has pardoned those individuals that have violated the law and blocked abortion access at their clinics.

THE COURT: And the FACE Act is specifically mentioned in these papers as one of the prosecutions under that Act are deemed to be weaponization somehow, and those people may be entitled to reimbursement.

MS. BOISTURE: That's right, Your Honor. That's right.

And that similar line of reasoning applies for our client, Common Cause, because the fund has always been broadcast by the President as a fund that will be available to those that were prosecuted for their January 6th crimes. And we know already that those -- many of those individuals are filing claims from the fund.

I find it interesting that counsel for the defendants says that there should be additional briefing on whether the defendants will suffer any harm. I don't understand how he can

15

reconcile that with the defendants' position that the fund is not going forward.  If what defendants are saying is true, there is no harm for this Court to enter its preliminary injunction.

THE COURT:  All right.  Thank you.

The other thing I noticed is you cited in your brief the *Planned Parenthood of South Carolina* case, which is a Fourth Circuit case that addressed the issue of standing when there's an issue about whether the state -- in this case it was a state, not the federal government -- was favoring one particular political view.  And it's interesting that the remedies that the Court in that case looked at was either allowing the people who were feeling that they were being discriminated against by not being able to participate in the -- this license plate business, or canceling the whole program.

So one of the options that the Fourth Circuit recognized in this type of situation with First Amendment discrimination is the authority of the Courts to cancel the program.  And so I think again you've -- and I don't recall that the defendant responded at all to the *Planned Parenthood* case in their opposition.

MS. BOISTURE:  I believe you're right, Your Honor.

THE COURT:  Yeah.  Okay.

Well, again, I'm satisfied this record clearly

16

establishes that there would be irreparable injury to the plaintiffs if this fund were allowed to go forward in any respect.

And lastly, so the last factor is -- because the balance of harms tips clearly in favor of the plaintiff, and I don't really see any genuine injury to the defendant if a preliminary injunction were granted.

I think the last thing is the public interest.  And in that respect -- I don't think we have anybody here from the amicus briefs, but I'm going to read into the record the -- some of that brief.  Because here we have both a democratic and republican senator who have filed an amicus brief in the court, and that ends with the following:  "To deliberately deploy public finds, in violation of the Constitution and the laws of the nation, to compensate these perpetrators is to use the machinery of democratic government to subsidize an attack on that government's most fundamental processes.  Congress itself, as both victim and the federal government's sole appropriating authority, has a compelling institutional interest in ensuring that no public fund is converted into a reward for those who laid siege to it.  A scheme deliberately designed to recast insurrectionists -- including those who have perpetrated violence against law enforcement officers -- as victims and legitimate prosecutions as persecution, does not merely rewrite history; it creates incentives for similar conduct in the

17

future, with the explicit encouragement of the officials responsible for administering justice."  And for that reason, the amici have filed their brief.

But the public interest in this case is very, very strong, in my view, and tilts very strongly in favor of, at this point, a preliminary injunction.

The concept that nearly $1.8 billion of U.S. taxpayer dollars would be diverted to favor an extremely small group of people, who have engaged in conduct which a significant number of Americans feel is unacceptable, is problematic.  And as I said, the amicus brief points out so clearly that the separation of powers is absolutely involved in this situation. And so for all of these reasons, I'm granting your motion for preliminary injunction.

Now, if the government truly means what it means in terms of this fund is over and this attempt to use taxpayer dollars to reward certain types of people for their political activities, I'm going to give you a week to see if you can come up with an agreement.  If, in fact -- because as I understand the plaintiffs' position, if you get a declaration, a clear unambiguous declaration under the penalty of perjury that would have to be signed off by the Acting Attorney General and the Secretary of the Treasury, because they are the two defendants, that you would dismiss this case; is that correct?

MS. BOISTURE:  Your Honor, we would -- we wouldn't be

18

moving for a preliminary injunction anymore.  I do need to confer with our clients as to whether or not we would actually fully dismiss the case at that point.

THE COURT:  All right.  Now, I thought at least -- and, again, I know you're not related to the case in D.C.  I thought that that kind of a clear declaration would satisfy that plaintiff, but you think there's something else you would want besides just a -- as I said, a clear unambiguous declaration would not be sufficient?

MS. BOISTURE:  Your Honor, the reason being that there's this other document in play that has also put the fund in motion, that's the settlement agreement at issue in *Trump v. IRS*.  And so, yes, while a signed sworn testimony would go most, or at least a lot of the way, I think that's something we need to figure out as to that missing element of the *Trump v. IRS* settlement.

THE COURT:  Well, that issue I'm not touching because it's before another judge in another district, whether or not that settlement is actually a valid legal settlement coming out of any kind of legitimate legal activity in that court, or whether it could -- so, I mean, I don't think that's appropriate, and that's beyond the scope of what this Court, I think, has before it; all right?

MS. BOISTURE:  Sure, Your Honor.  We have always seen those two documents as interrelated, given that the settlement

19

Stephanie Austin, RPR, CRR USDC/EDVA

agreement actually prompted the Associate -- I'm sorry, the Acting Attorney General to issue that order on May 19th.

I think if we're trying to think through our options here -- and if you don't mind, I just might confer to make sure my co-counsel agree.  But we will assess, both internally and with our clients, about whether or not the case as a whole can be dismissed.  We think that the Court's -- the order that you sound like you'll be making in about a week's time to come to an agreement with the government is something we will actively engage in and wholeheartedly engage in with the government.

THE COURT:  Let me do this, because, again, although it's gotten some degree of public interest, it's still a civil case before this Court; it's not going to be treated any differently.

So what's going to happen is, if, in that one-week time period, the government chooses not to file, you know, that kind of a declaration -- and even if you don't accept it, I might find it sufficient at that point to moot the case.  But if that's not done, then I will issue our standard scheduling order.  So you don't need expedited discovery; our orders are fast enough.  All right.  I will require the government to file a response to the lawsuit within 30 days of that time period.  All right.  So you'll get a subsequent order in about a week.

But I'll issue an order today that will enter a preliminary injunction.  All right.  And that's going to be in

20

place then until the next step.  The next step, I don't know when that will be.  But it's in step until the case either settles or there's a dispositive motion of some kind that might resolve things; all right?

MS. BOISTURE:  Thank you, Your Honor.

THE COURT:  All right.  Did you have something you wanted to say?

MR. BLOCK:  We did raise in our brief --

THE COURT:  At the lectern, yeah.

MR. BLOCK:  Apologies, Your Honor.

We did raise in our brief the prospect of a bond, and I wanted to see if the Court wanted to address that.

THE COURT:  Since I don't find any injury or harm that's going to result to the defendants as a result of putting a preliminary injunction in place, I'm not composing any bond.

MR. BLOCK:  Yes, Your Honor.

THE COURT:  All right.  We'll recess court for the day.

(Proceedings adjourned at 10:43 a.m.)

------------------------------------

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

*Stephanie Austin*

Stephanie M. Austin, RPR, CRR

21

Stephanie Austin, RPR, CRR USDC/EDVA