**Exhibit**

Case No: 1:26-cv-2323-JMC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN O. BRENNAN, | ) |
| Notice of address filed under seal, | ) |
|  | ) |
| *Plaintiff*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| TODD W. BLANCHE, in his official | ) |
| capacity as Acting Attorney General, | ) |
| 950 Pennsylvania Avenue, NW, | ) |
| Washington, DC 20530, *et al*., | ) |
|  | ) |
| *Defendants*. | ) |
|  | ) |

**THE STEADY STATE'S BRIEF SUPPORTING PLAINTIFF'S
REQUEST FOR INJUNCTIVE RELIEF**

Kevin Thomas Carroll
DC Bar No. 1021479
Partner, Mark S. Zaid, PC
1250 Connecticut Avenue, NW, Suite 700
Washington, DC 20036
718-791-5761

*Counsel for The Steady State*

1

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**………………………………………………………………ii

**INTRODUCTION**……………………………………………………………………….1

ARGUMENT…………………………………………………………………………...2

Background……………………………………………………………………………..2

*Intelligence Community Assessment*…………………………………………………....2

*Helsinki Summit*………………………………………………………………………...3

*Mueller Report*…………………………………………………………………………3

*Horowitz Report*…...…………………………………………………………………4

*Senate Report*………………………………………………………………………...4

*Durham Report*………………………………………………………………………6

*House Report*………………………………………………………………………...6

MAJORITY REPORT……………………………………………………………………7

MINORITY REPORT……………………………………………………………………7

Defendants' retribution campaign against Plaintiff……………………………………….8

The presumption of regularity is gone……………………………………………………...10

The Steady State's interest………………………………………………………………14

The public interest……………………………………………………………………15

*Retaliatory investigations and prosecutions of intelligence officers are instruments of authoritarian* consolidation…...………………………………………………………16

*Robert Jackson's advice as Attorney General and Supreme Court* Justice………………...17

*Risk to intelligence agencies from authoritarian capture*………………………………..18

*Danger to the Republic from the abuse of law enforcement powers to enable the authoritarian capture of intelligence* agencies……………………………………………………….20

CONCLUSION………………………………………………………...……………2

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Brennan v. Blanche, et al.*, 1:26-cv-2323 (D.D.C., Jul. 1, 2026)……………………………*passim*

*Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024)…………………………………………………10

*Driscoll v. Patel*, 1:25-cv-3109 (D.D.C., Mar. 31, 2026)...……………………………………11

*People v. Trump*, 237 N.Y.S.3d 443 (2025)…………………..…………………………………10

*People v. Trump*, 224 N.Y.S.3d 832 (2024)…………………..…………………………………10

*Trump v. IRS*, 2026 U.S. Dist. LEXIS 154806 (S.D.Fla., Jul. 13, 2026)……………………11, 21

*Trump v. United States*, 603 U.S. 593 (2024)……………………………………………………10

*United States v. Bolton*, 8:25-cr-314 (D.Md., Jun. 26, 2026)……………………………………12

*United States v. Comey*, 810 F. Supp. 3d 768 (E.D.V.A. 2025)…………………………………13

*United States v. Comey*, 4:26-cr-16 (E.D.N.C., Apr. 28, 2026)……………………………….…13

*United States v. James*, 810 F. Supp. 3d 752 (E.D.V.A 2025)………………………………...13

*United States v. Trump*, l:23-cr-257 (D.D.C., Aug. 1, 2023)……………………………………10

*United States v. Trump, et al.*, 9:23-cr-80101 (S.D.Fla., Jul. 27, 2023)…………………………10

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)……………..………………..17-18

<u>Statutes</u>

FEDERAL RULE OF APPELLATE PROCEDURE 29, *Brief of an Amicus Curia*e……………….…..1, 21

FEDERAL RULE OF CRIMINAL PROCEDURE 6, *The Grand Jury*…………………...………......9-10

N.Y. EXECUTIVE § 63.12, *General duties*.................................................................................10

N.Y. PENAL § 175.10, *Falsifying business records in the first degree*…………………………...10

18 U.S.C. § 241, *Conspiracy against rights*……………………………………………..9, 10

18 U.S.C. § 371, *Conspiracy to defraud the United States*……………………………...………10

18 U.S.C. § 793, *Gathering, transmitting or losing defense information*………...……….10, 12

18 U.S.C. § 871, *Threats against the President*……………………………………………….13

18 U.S.C. § 1001, *False statements*…………………………………………………..8-10, 13

18 U.S.C. § 1334, *Bank fraud*……………………………………………………………….13

18 U.S.C. § 1505, *Obstruction of pending proceeding*……..…………………………………13

18 U.S.C. § 1510, *Obstruction of criminal investigations*……………………………………10

18 U.S.C. § 1512, *Tampering with a witness*…………………………………………………10

18 U.S.C. § 2381, *Treason*…………………………………………………………………...9

28 U.S.C. § 1651, *Writs*………………………………………………………………….21

28 U.S.C. § 1361, *Action to compel an officer of the United States to perform his* duty..............21

Other authorities

163 Cong. Rec. 4 (2017)……………………………………………………………………….2

166 Cong. Rec. 12 (2020)…………………………………………………………………….11

167 Cong. Rec. 24 (2021)…………………………………………………………………….11

Office of the Dir. of Nat'l Intelligence, *Assessing Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017)………………….…………………………….......2, 3

R. Jackson, *The Federal Prosecutor,* Dep't of Justice (Apr. 1, 1940)…………….………..18-20

*Five Men Arrested and Charged in Plot to Attack and Kill Government Officials and Others Attending the Ultimate Fighting Championship at White House,* Dep't of Justice (Jun. 16, 2026)……………………………………………………….11

J. Jordan letter to P. Bondi (Oct. 21, 2025)………………………………………...……8-9

*Justice Manual*…………………………………………………………………….10

R. Tate, *Kash Patel draws flak for posting FBI case details on social media 'to make himself look good,'* The Guardian (Jun. 30)…………………………………….11

A. Oliver, *Kash Patel's false start on Charlie Kirk killer draws scrutiny,* Fox News (Sep. 13, 2025)…………………………………………………………………….11

S. Fitzpatrick, *Kash Patel has alarmed colleagues with episodes of excessive drinking and unexplained absences*, THE ATLANTIC (Apr. 17, 2026)……………………………………..11

*Majority Staff Report on the Intelligence Community Assessment (ICA) "Russia's Influence Campaign Targeting the 2016 US Presidential Election,"* House Permanent Select Comm. on Intelligence (Jul. 22, 2025)…………………………………7

*Minority Views,* House Permanent Select Comm. on Intelligence (Jul. 22, 2025)……...……….7-8

J. Raskin letter to T. Blanche (Jul. 14, 2026)………………………………………………….12

J. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns,* Dep't of Justice (May 12, 2023)……………...6

*Report on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election*, Senate Select Comm. on Intelligence (Aug. 18, 2020)………………………………………4-5

R. Mueller, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Dep't of Justice (Mar. 22, 2019)………………………………………...4-5

A. Grayer, *Republican Sen. Grassley probing FBI Director Patel's travel and spending*, CNN (Jul. 9, 2026)………………………………………………………………………………….11

M. Horowitz, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation,* Dep't of Justice (Dec. 20, 2019)……………………………..4

*Tracking retaliatory use of arrests, prosecutions, and investigations by the Trump administration*, Protect Democracy (Jul. 16, 2026)………………………………………..12-13

S. Horsley, *Trump's Refusal To Back U.S. Intel Over Russia At Putin Summit Sparks Bipartisan Ire,* NATIONAL PUBLIC RADIO (Jul. 16, 2018)…………………………………3

**INTRODUCTION**

The Steady State, an unincorporated association, is a non-profit advocacy organization comprised of 420 former senior United States government officials.  The collective careers of *amicus'* members span decades of service across Republican and Democratic administrations in all three branches of government:  as ambassadors, congressional staffers, foreign service officers, intelligence officers, oversight officials, policy advisors and prosecutors.

The Steady State's interest in this case is that its members dedicated their professional lives to defending America's democratic values and the rule of law at home, and promoting those values abroad, with extensive experience balancing homeland and national security imperatives against constitutional and legal frameworks that protect individual rights.  Many of *amicus'* members spent their careers confronting, reporting on and studying the rise of authoritarian governments across the globe—in regimes that misuse intelligence, internal security and military services and paramilitary militias to consolidate a political leader's power by suppressing lawful dissent and violating laws.

Some Steady State members served in the intelligence, internal security and military elements being misused within the U.S. by the current Administration, and therefore understand how dangerous such institutions are when directed by the whim of a political leader and unconstrained by law.  *Amicus'* members experience gives them unique perspective into how perilous it is for a democracy to allow, in this case, its law enforcement powers and security services to be misused for a president's personal and political purposes.[1]

---

[1]  Further to F.R.A.P. 29 (a)(4)(D), this brief is filed on the authority of The Steady State Executive Director Steven  A. Cash.

1

**ARGUMENT**

I.      Background.

The following three statements are true.  Defendant Donald Trump legitimately won the 2016 presidential election.[2]  Almost all U.S. government investigations into the matter concluded that Russia's government sought to help Defendant Trump prevail in that contest.  However, investigators did not establish that Defendant Trump's campaign cooperated with Russia's election interference activities.  A brief review of the factual bases for those statements is unfortunately necessary, given Defendants' attempts to undermine their veracity, and their importance to *amici*'s argument.

*(a) Intelligence Community Assessment.*

On January 6, 2017, the Office of the Director of National Intelligence and the National Intelligence Council, in a twenty five-page Intelligence community Assessment ("ICA"), concluded with "high confidence" that

> Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election.  Russia's goals were to undermine public faith in the US democratic process, denigrate Secretary [Hillary] Clinton, and harm her electability and potential presidency.  We further assess [Vladimir] Putin and the Russian Government developed a clear preference for President-elect Trump.[3]

Plaintiff participated in preparing this assessment in his role as CIA director.

---

[2]  Vice President Joseph Biden stated, as President of the Senate, that "The whole number of electors appointed to vote for President of the United States is 538.  Within that whole number, a majority is 270.  The votes for President of the United States are as follows:    Donald J. Trump of the State of New York has received 304 votes …".  163 Cong. Rec. 4 (2017).

[3]  *Assessing Russian Activities and Intentions in Recent US Elections* at ii.  Available at https://www.govinfo.gov/content/pkg/GOVPUB-PREX28-PURL-gpo76345/pdf/GOVPUB-PREX28-PURL-gpo76345.pdf.

*(b) Helsinki Summit.*

At a July 16, 2018, summit in Finland with Russian President Putin, a reporter asked

Defendant Trump whether he agreed with the ICA's conclusions.  Defendant Trump replied,

> I have great confidence in my intelligence people.  But I will tell you that
> President Putin was extremely strong and powerful in his denial today.  Dan Coats
> [the director of national intelligence] came to me and some others, they said they
> think it's Russia.  I have President Putin.  He just said it's not Russia.  I will say
> this.  I don't see any reason why it would be.[4]

Even Republican officials disagreed with Defendant Trump.  Senator John McCain

stated, "Today's press conference in Helsinki was one of the most disgraceful performances by

an American president in memory."  House Speaker Paul Ryan stated, "The United States must

be focused on holding Russia accountable and putting an end to its vile attacks on democracy."[5]

*(c) Mueller Report.*

On March 22, 2019, a special counsel appointed by Defendant Trump's Department of

Justice, Robert Mueller, concluded in a 448-page report that

> Russia interfered in the 2016 presidential election principally through two
> operations.  First, a Russian entity carried out a social media campaign that
> favored presidential candidate Donald J. Trump and disparaged presidential
> candidate Hillary Clinton.  Second, a Russian intelligence service conducted
> computer-intrusion operations against entities, employees, and volunteers working
> on the Clinton Campaign and then released stolen documents.  The investigation
> also identified numerous links between the Russian government and the Trump
> Campaign.  Although the investigation established that the Russian government
> perceived it would benefit from a Trump presidency and worked to secure that
> outcome, and that the Campaign expected it would benefit electorally from
> information stolen and released through Russian efforts, the investigation did not

---

[4]  S. Horsley, *Trump's Refusal To Back U.S. Intel Over Russia At Putin Summit Sparks Bipartisan Ire,* NATIONAL PUBLIC RADIO (Jul. 16, 2018).

[5]  *Id*.

3

establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities.[6]

*(d) Horowitz Report.*

A 478-page December 20, 2019, report by the Justice Department's inspector general, Michael Horowitz, criticized some aspects of the Federal Bureau of Investigation's counterintelligence probe of the 2016 election, but did not examine the 2017 ICA.[7]  The Horowitz Report noted, however, that senior FBI officials including Director James Comey stated that while Plaintiff "shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane."[8]

*(e) Senate Report.*

On August 18, 2020, the U.S. Senate's Select Committee on Intelligence concluded on a bipartisan basis in a 1,361page report that "The Russian government directed extensive activity, beginning in at least 2014 and carrying into at least 2017, against U.S. election infrastructure at

---

[6]  R. Mueller, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. I at 1-2, Dep't of Justice, available at https://www.justice.gov/archives/sco/file/1373816/dl?inline=.

The Mueller Report failed to reach a conclusion as to whether Defendant Trump obstructed the special counsel's investigation:  "[If] we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state.  Based on the facts and the applicable legal standards, we are unable to reach that judgment. Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him."  *Id.*, Vol. II at 182.

[7]  *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*.  Dep't of Justice, available at https://www.justice.gov/storage/120919-examination.pdf.

[8]  *Id.* at 56.

4

the state and local level.  [redacted]  The Committee has seen no evidence that any votes were changed or that any voting machines were manipulated."[9]

The Senate intelligence committee also concluded that the Russian government's Internet Research Agency "sought to influence the 2016 U.S. presidential election by harming Hillary Clinton's chances of success and supporting Donald Trump at the direction of the Kremlin."[10]

The Senate committee further concluded that the 2017 ICA

> [P]resents a coherent and well-constructed intelligence basis for the case of unprecedented Russian interference in the 2016 U.S. presidential election.  On the analytic lines of the ICA, the Committee concludes that all analytic lines are supported with all-source intelligence, although with varying substantiation.  The Committee did not discover any significant analytic tradecraft issues in the preparation or final presentation of the ICA.[11]

The Senate committee finally concluded that the "Russian government engaged in an aggressive, multifaceted effort to influence, or attempt to influence, the outcome of the 2016 presidential election," and detailed the activities of several of Defendant Trump's campaign and presidential transition officials, as well as Russian intelligence operatives, and interactions between some of them.[12]

---

[9] *Report on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election*, Vol. 1 at 3-4, U.S. Senate Select Comm. on Intelligence, available at https://www.intelligence.senate.gov/2020/08/18/publications-report-select-committee-intelligenc e-united-states-senate-russian-active-measures/.

[10] *Id.*, Vol. 2 at 4.

[11] *Id.*, Vol. 4 at 6.

[12] *Id.*, Vol. 5 at v.

*(f) Durham Report.*

On May 12, 2023, yet another special counsel appointed by Defendant Trump's Justice Department, John Durham, investigated the investigation into Russian interference in the 2016 election, and issued a 316-page report which concluded that one defendant, a former FBI attorney, "committed a criminal offense by fabricating language in an email that was material to the FBI obtaining a [Foreign Intelligence Surveillance Act] order."[13]

The Durham Report notes that "The public record contains a substantial body of information relating to former President Trump's and the Trump Organization's relationships with Russian businesses, Russian business people, and Russian officials, as well as separate evidence of Russia's attempts to interfere in the 2016 presidential election."  That report makes a single mention of the 2017 ICA, as a "see also" cite in a footnote to the statement praising the scope of these earlier inquiries, the amount of important information gathered, and the contributions they have made to our understanding of Russian election interference efforts" as "a tribute to the diligent work and dedication of those charged with the responsibility of conducting them."[14]  The Durham Report also cites Plaintiff's voluntary cooperation with the investigation.[15]

*(g) House Report.*

The House intelligence oversight committee's Majority and Minority Members issued separate reports on Russia's interference in the 2016 election.

---

[13]  J. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* at 17, available at https://www.justice.gov/archives/media/1381211/dl.

[14]  *Id*. at 7, fn. 19.

[15]  *See id*. at 4, fn. 13.

(1)  MAJORITY REPORT.

On July 22, 2025, the U.S. House of Representatives Permanent Select Committee on Intelligence's Majority (Republican) Members released a 253-page oversight investigation and referral report which found credible the ICA's judgments that

1)  President Putin ordered conventional and cyber influence operations, notably by leaking politically sensitive emails obtained from computer intrusions; 2)  Putin's principal motivations in these operations were to undermine faith in the US democratic process and to weaken what the Russians considered to be an inevitable Clinton presidency; and 3)  Putin held back leaking some compromising material for post-election use against the expected Clinton administration.[16]

However, the House committee's Majority also found that the ICA's judgment "that Putin developed 'a clear preference' for candidate Trump and 'aspired to help his chances of victory' did not adhere to" Intelligence Community analytic standards.[17]

Plaintiff testified to the House committee on May 23, 2017.  He stated that

I encountered and am aware of information and intelligence that revealed contacts and interactions between Russian officials and U.S. persons involved in the Trump campaign that I was concerned about because of known Russian efforts to suborn such individuals, and it raised questions in my mind … whether or not the Russians were able to gain the cooperation of those individuals [however] l don't know whether or not such collusion … existed.[18]

---

[16]  *Majority Staff Report on the Intelligence Community Assessment (ICA)  "Russia's Influence Campaign Targeting the 2016 US Presidential Election"* at 1, House Permanent Select Comm. on Intelligence, available at declassified-hpsci-report-manufactured-russia-hoax-july2025_plus_dear_reader.pdf.

[17]  *Id*.

[18]  *See id*. at 61.

7

(ii)    MINORITY REPORT.

The Democratic Minority countered in a ninety eight-page report that the House committee's investigation confirmed the ICA's judgment, "That the Trump campaign, and Donald Trump himself, invited illicit Russian help, made full use of that help, and then lied and obstructed the investigations in order to cover up this misconduct." The minority further released fifty-eight interview transcripts and six other documents in support of their view.[19]

### 

None of these six exhaustive official reports, three by the Justice Department itself, accuse Plaintiff of any misconduct whatsoever. The single substantive discrepancy among the reports is whether the judgment of the ICA which Plaintiff and others reached—that Putin developed "a clear preference" for Defendant Trump and "aspired to help his chances of victory"—adhered to Intelligence Community analytic standards. Only the House committee's Republican Majority alleged that this judgment did not meet such high standards.

II.    Defendants' retribution campaign against Plaintiff.

The 2017 Intelligence Community Assessment is almost a decade old; any purported crime related to its drafting is now obviously beyond the statute of limitations. Yet on October 21, 2025, House of Representatives Judiciary Committee Chairman Jim Jordan made a criminal referral of Plaintiff to Attorney General Pamela Bondi, alleging that on May 11, 2023, Plaintiff made a false statement to Congress in violation of 18 U.S.C. § 1001.[20]

---

[19] *Minority Views*. House Permanent Select Comm. on Intelligence, available at https://democrats-intelligence.house.gov/russiainvestigation/.

[20] Available at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2025-10-21-jdj-to-doj-bondi-re-brennan-criminal-referral.pdf.

In sum and substance, Chairman Jordan argues as follows.  Plaintiff's reported agreement, only at the request of the FBI, to include a two-page summary of poorly-sourced allegations about Defendant Trump's alleged sexual blackmail by Russian intelligence while on a trip to Moscow as a private citizen (the "Steele dossier"), as a highly-restricted annex to the ICA, materially contradicts Plaintiff's statement that "the CIA was not involved at all with the dossier."  *See id.*

On these bases—his disagreement with the conclusions of the 2017 assessment that Plaintiff helped produce, and Plaintiff's purported false statement to Congress—Defendant Trump publicly accuses Plaintiff of treason (a capital crime, *see* 18 U.S.C. § 2381) and posts doctored images of Plaintiff in a prison jumpsuit.[21]

Defendant Joseph diGenova, formerly one of Defendant Trump's criminal defense lawyers, now serving as Counselor to the Attorney General, is reportedly assigned to lead investigations into an alleged "grand conspiracy" involving Plaintiff to deprive Defendant Trump of his civil rights, presumably in violation of 18 U.S.C. § 241, by investigating the now-proven Russian interference in the 2016 presidential election, and into Plaintiff's recently alleged Section 1001 violation.

Defendant DiGenova reportedly stated that Plaintiff  "should get a good lawyer,"[22] described Defendant Trump's revocation of Plaintiff's security clearance as a "glorious day for America," publicly pronounced Plaintiff "evil" and "a traitor" and concluded that the supposed conspiracy against the president "began with John Brennan and ends with John Brennan."[23]

---

[21]  *See* Dkt. 1 at 3.

[22]  Dkt. 1 at 14, fn. 6.

[23]  *Id.* at 19-20, fn. 31.

Plaintiff is now the target of two grand jury investigations led by Defendant DiGenova, without good faith justification, and clearly as a matter of political retribution. Defendant DiGenova's public statements about Plaintiff are grossly unprofessional given that context, in violation of the Federal Rules of Criminal Procedure's prohibition on government attorneys disclosing grand jury matters,[24] as well as Justice Department policy to not comment about ongoing investigations.[25]

III.    The presumption of regularity is gone.

The Trump Administration's Justice Department no longer deserves the presumption of regularity, especially in Plaintiff's case. A New York State criminal court convicted Defendant Trump of falsifying business records;[26] federal grand juries in Washington, DC and Florida indicted him for conspiracies against rights, to defraud the United States and to obstruct an official proceeding, false statements, mishandling defense information, obstruction of justice and witness tampering;[27] a federal court in New York found him liable for defaming a woman he sexually assaulted,[28] a New York State civil court found him liable for fraud;[29] and the House of

---

[24] *See* FED. R. CRIM. P. 6(e)(2)(B)(vi) (stating that government attorneys must not disclose grand jury matters).

[25] *See Justice Manual* § 1-7.400 at 3-4 (stating that DOJ generally will not comment about ongoing investigations), available at https://www.justice.gov/jm/jm-1-7000-media-relations#1-7.400.

[26] N.Y. PENAL § 175.10; *see People v. Trump*, 224 N.Y.S.3d 832, 868-69 (2024).

[27] 18 U.S.C. §§ 241, 371, 1512, 1001, 793, 1510 and 1512; *see United States v. Trump, et al.*, 9:23-cr-80101 (S.D.Fla. Jul. 27, 2023) at Dkt. 60, and *United States v. Trump*, l:23-cr-257 (D.D.C. Aug. 1, 2023) at Dkt. 1, both cases obviated by the Supreme Court's presidential immunity decision in *Trump v. United States*, 603 U.S. 593, 642 (2024).

[28] *See Carroll v. Trump*, 124 F.4th 140, 150 (2d Cir. 2024).

[29] N.Y. EXEC § 63(12)*, see People v. Trump*, 237 N.Y.S.3d 443, 446 (2025).

Representatives impeached (but the Senate acquitted) him for abuse of power, obstruction of Congress and incitement of an insurrection.[30]

Recently the U.S. District Court for the Southern District of Florida referred Defendant Todd Blanche, acting attorney general of the U.S., for bar discipline regarding his unethical conduct in purporting to represent the government against his former personal client in *Trump v. IRS*, a case in which Defendant Trump unsuccessfully sought ten billion dollars from taxpayers.[31]

Defendant Kash Patel, the FBI director, allegedly broke the law by firing agents for partisan reasons;[32] posts misinformation,[33] and information about sealed cases,[34] on social media; is under investigation by the Senate Judiciary Committee for misusing government resources for personal reasons,[35] and stands accused of drinking on the job.[36]

There is every reason to believe that Defendants' investigation and threatened prosecution of Plaintiff is in bad faith.

---

[30]  *See* 166 CONG. REC. 12 (2020); 167 CONG. REC. 24 (2021).

[31]  *See* 2026 U.S. Dist. LEXIS 154806 (S.D.Fla. Jul, 13, 2026) at * 63, fn. 70.

[32]  *See Driscoll v. Patel*, 1:25-cv-3109 (D.D.C., Mar. 31, 2026), Dkt. 1.

[33]  *See* A. Oliver, *Kash Patel's false start on Charlie Kirk killer draws scrutiny*, FOX NEWS (Sep. 13, 2025).

[34]  *See* R. Tate, *Kash Patel draws flak for posting FBI case details on social media 'to make himself look good,'* THE GUARDIAN (Jun. 30); *see also* Department of Justice, *Five Men Arrested and Charged in Plot to Attack and Kill Government Officials and Others Attending the Ultimate Fighting Championship at White House*, available at https://www.justice.gov/opa/pr/five-men-arrested-and-charged-plot-attack-and-kill-government-officials-and-others-attending.

[35]  *See* A. Grayer, *Republican Sen. Grassley probing FBI Director Patel's travel and spending*, CNN (Jul. 9, 2026).

[36]  *See* S. Fitzpatrick, *Kash Patel has alarmed colleagues with episodes of excessive drinking and unexplained absences*, THE ATLANTIC (Apr. 17, 2026).

Furthermore, federal judges since January 20, 2025, repeatedly cite this Justice Department for a lack of candor to the courts. A July 14, 2026, letter from House Judiciary Committee Ranking Member Jamie Raskin to Defendant Blanche states that "In **hundreds** of cases over the past 18 months, federal judges have called into question the truthfulness of DOJ's statements to the court and the Department's good faith compliance with court orders. These judges have been appointed by every president from Ronald Reagan to Donald Trump himself" (emphasis supplied).[37] In this jurisdiction alone, Ranking Member Raskin cites judges describing DOJ lawyers as "disingenuous," questioning their "good faith," holding them in criminal contempt, and saying that they lack "the level of diligence the Court expects from any litigant."[38]

Also since January 20, 2025, Defendants Trump, Blanche and Patel repeatedly investigated and tried to prosecute at least **thirty-three** of Defendant Trump's perceived political adversaries,[39] resulting in just a single guilty plea so far.[40]

Publicly disclosed but failed criminal investigations include probes of the Federal Reserve chairman, allegedly for false statements to Congress regarding renovations to the central bank's building, but in reality for failing to lower interest rates; the governor and attorney general

---

[37] Available at 2026-07-14-raskin-to-blanche-doj-re-defiance-of-court.pdf, citing to R. Goodman, *The "Presumption of Regularity" in Trump Administration Litigation*, JUST SECURITY, available at https://www.justsecurity.org/120547/presumption-regularity-trumpadministration-litigation/.

[38] *Id.*

[39] *See Tracking retaliatory use of arrests, prosecutions, and investigations by the Trump administration*, Protect Democracy (Jul. 16, 2026), available at https://protectdemocracy.org/work/retaliatory-action-tracker/.

[40] *See United States v. Bolton*, 8:25-cr-314 (D.Md. )(Jun. 26, 2026), Dkt. 81, in which Trump's former national security advisor pleaded guilty of violating 18 U.S.C. § 793, *Gathering, transmitting or losing defense information*.

12

of Minnesota, the mayors of Minneapolis and Saint Paul and a district attorney, for opposing deadly federal immigration enforcement operations in their jurisdictions; six Members of the House and Senate, for reminding troops to only follow lawful orders; one US senator for leading impeachment efforts against Defendant Trump during his first term, and another for asking a question of the homeland security secretary at a press conference, and the mayor of Newark for protesting at an immigration detention facility.[41]  Investigations of the governor of California, a Federal Reserve governor, the former chief of staff of the Department of Homeland Security, the former director of the Cybersecurity and Infrastructure Security Agency, and a congresswoman reportedly continue.[42]

A grand jury indicted New York State Attorney General Letitia James for, *inter alia*, alleged bank fraud in violation of 18 U.S.C. § 1334, and a district court dismissed that indictment.[43]  A grand jury indicted former FBI Director James Comey for allegedly making false statements to and obstructing Congress regarding the Bureau's investigation of Russian interference in the 2016 election, in violation of 18 U.S.C. §§ 1001 and 1505, and a district court dismissed that indictment, also.[44]  A grand jury in another jurisdiction indicted Director Comey again, for allegedly threatening to assassinate President Trump in violation of 18 U.S.C. § 871, by posting to social media a photo of seashells on a beach that he found arranged by a stranger in the shape of the numbers "8647."[45]

---

[41] *See Tracking retaliatory use of arrests, prosecutions, and investigations by the Trump administration*.

[42] *See id.*

[43] *See United States v. James*, 810 F. Supp. 3d 752, 754 (E.D.V.A 2025).

[44] *See United States v. Comey*, 810 F. Supp. 3d 768, 771 (E.D.V.A. 2025).

[45] *See United States v. Comey*, 4:26-cr-16-FL-RN (E.D.N.C.) (Apr. 28, 2026), Dkt. 1.

IV.    The Steady State's interest.

Plaintiff's distinguished public career included twenty-five years of CIA service, culminating in his serving as the Agency's Director from 2013 to 2017. (Dkt. 1 at 2.)  Plaintiff asserts his rights as an individual citizen improperly under federal law enforcement investigation. His complaint is appropriately tied to the facts and law of his own prospective criminal case. The Steady State seeks to speak to this Court on behalf of its members who are also former diplomatic, law enforcement, homeland and national security officials—producers and consumers of intelligence, many with experience observing authoritarian regimes overseas. *Amici* share Plaintiff's goal of preserving and eventually exposing records of  government misconduct in this case, but for their own reasons.

Plaintiff is targeted by Defendants solely because he concluded both that (a) Russia interfered in the 2016 election, and that (b) Putin preferred that Defendant Trump win the presidency.  Every U.S. government investigation into this matter agrees upon proposition (a). Four investigations beyond the 2017 ICA, three by the Justice Department, including two by special counsels appointed by Defendant Trump's first administration, either corroborate or do not dispute the ICA's conclusion on point (b).  A fifth investigation, by the House intelligence committee, divided upon partisan lines only regarding point (b).

The inappropriate threats against and criminal investigations of Plaintiff, only because he endorsed Intelligence Community career public servants' assessment that Russia preferred that Defendant Trump win the 2016 election, chill Steady State members' speech.  Many of these former officials also wish to exercise First Amendment rights to speak out, based on their unique expertise, about problems such as foreign election interference, Russia, and other issues impacting democracy, rule of law and national security, without the serious risk of being

14

investigated like Plaintiff.  The Steady State members' position is therefore relevant to the disposition of this case.

Given the demonstrably poor ethics of Defendants Trump, Blanche, DiGenova and Patel, the dishonesty to the courts generally (and this Court specifically) since January 20, 2025, of Defendant the DOJ, and Defendant Trump's pursuit of his perceived enemies through the criminal justice system, Steady State members hold every good reason to fear being vindictively persecuted like Plaintiff if they speak out on issues of public concern in ways that displease this administration—such as Russian interference in American elections.  Steady State members are exposed to the risk of being punished, as Tomás de Torquemada punished heretics during the Spanish Inquisition, or Andrey Vyshinsky and Lavrenti Beria punished perceived enemies during Josef Stalin's purges, if only they publicly concur with the near-unanimous prior judgement of the U.S. government that Putin sought to help Defendant Trump win the 2016 election.

V.    The public interest.

For generations, American courts confronted with allegations of governmental overreach appropriately looked to the Founding era as the principal historical reference point for assessing the constitutional limits of state power.  Grievances catalogued in the Declaration of Independence and the Framers' response to those abuses long provided the backdrop against which claims implicating individual liberty and the separation of powers are understood.  That historical perspective served our constitutional order well, supplying enduring principles that guided judicial decision-making through successive periods of political and social change.

The constitutional questions presented today, however, arise in circumstances the Framers could scarcely imagine.  Modern technologies, communications, and administrative institutions transformed both the capacities of government and the means by which democratic institutions

15

may be strengthened—or weakened.  While the principles established at the Founding remain constant, historical experience illuminating their application need not be confined to the eighteenth century.  Recent history offers additional instruction.

    *(a) Retaliatory investigations and prosecutions of intelligence officers are instruments of authoritarian consolidation.*

Across the last century, and particularly in recent decades, the world witnessed the emergence, consolidation and, in some instances, reversal of authoritarian rule under conditions that bear a closer resemblance to contemporary democratic societies than those existing at the time of the Nation's founding.  Those experiences, largely occurring abroad, provide a body of historical evidence from which constitutional democracies may learn without suffering those experiences themselves.

The Steady State respectfully submits that it is uniquely situated to assist the Court in considering that body of experience.  Its perspective is informed by many years of professional observation and analysis of governments overseas, including sustained study of the methods by which democratic institutions are eroded, executive power is expanded beyond traditional constraints, and civil liberties are diminished—often incrementally and under color of law.  This brief does not contend that present circumstances are identical to those historical examples.  Rather, it offers those modern experiences as a supplementary historical framework that may assist the Court in evaluating the constitutional claims before it, and in appreciating how enduring constitutional principles operate in the conditions of contemporary governance.

The concerns presented in Plaintiff's case are different in form from those involving domestic military deployments, but they arise from the same constitutional danger.  Throughout their professional careers, members of *amicus* observed authoritarian governments employ security institutions not principally to protect the nation from external threats, but to protect

16

political leadership from domestic opposition.  One of the earliest and most reliable indicators of democratic decline is the transformation of intelligence and law enforcement agencies from institutions serving a constitution into institutions serving a single political leader.

Unlike ordinary personnel disputes or isolated prosecutions, retaliatory criminal investigations directed toward current and former intelligence officers carry institutional consequences extending far beyond the individuals involved.  Their purpose is rarely limited to punishment of the targeted individual.  Rather, they communicate a broader message to every officer still serving:  independent judgment carries personal risk; loyalty to law must be subordinate to loyalty to political leadership; and continued professional advancement—or even personal liberty—depends upon conformity with the wishes of those exercising executive power.

Steady State members watched this pattern unfold repeatedly overseas.  Whether in Eastern Europe, Latin America, the Middle East, Asia or elsewhere, authoritarian consolidation commonly begins not with mass arrests, but with carefully selected investigations of respected officials whose professional independence presents an obstacle to executive control.  Such prosecutions serve three simultaneous purposes:  removing experienced institutional leaders, intimidating those who remain, and recruiting a new generation of officials whose primary qualification is personal loyalty rather than professional integrity.  Once this transformation occurs, intelligence services cease functioning as neutral instruments of national security and instead become mechanisms through which an executive identifies critics, suppresses dissent, and preserves political power.

*(b)  Robert Jackson's advice as Attorney General and Supreme Court Justice.*

Justice Robert Jackson understood these dangers perhaps better than any member of the Supreme Court.  His concurrence in *Youngstown Sheet & Tube Co. v. Sawyer* is informed not

17

merely by constitutional theory, but by his experience confronting, at Nuremberg, the machinery of a government that entirely subordinated legal institutions to its executive's will.[46]  His warning against "comprehensive and undefined presidential powers" reflected an understanding that constitutional democracies rarely disappear in a single dramatic event.  Rather, they are weakened incrementally as institutions intended to constrain executive authority are redirected toward preserving it.

These same concerns earlier animated Justice Jackson throughout his career as Attorney General.  Addressing United States Attorneys in 1940, Jackson reminded federal prosecutors that their duty is not to maximize convictions or satisfy political expectations, but "to seek justice."[47]  Attorney General Jackson warned that the prosecutor possesses extraordinary discretionary authority—the ability to determine whom to investigate, whom to charge and whom to leave alone—and that this power "is one of the most beneficent forces in our society" only when exercised with restraint and impartiality.

Conversely, Attorney General Jackson cautioned that the greatest danger arises when prosecutors first identify the individual they wish to punish and only thereafter search for a legal theory upon which to proceed.  Such conduct, Justice Jackson explained, transforms prosecution from an instrument of justice into an instrument of arbitrary power.

(c) *Risk to intelligence agencies from authoritarian capture.*

Jackson's warnings carry particular force when applied to intelligence officers.  Much of their work necessarily occurs outside public view, often involving classified information, confidential sources and sensitive operational judgments.  Because the public ordinarily lacks

---

[46]  *See* 343 U.S. 579, 634-55 (1952).

[47]  R. Jackson, *The Federal Prosecutor* (Apr. 1, 1940), Dep't of Justice, available at https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

18

access to the facts necessary to evaluate official decisions, intelligence professionals are especially vulnerable to politically motivated accusations. Once criminal process itself becomes the punishment, the mere initiation of an investigation may irreparably damage careers, reputations, financial security and the willingness of other officers to exercise independent professional judgment.

Steady State members served throughout the Intelligence Community, the Department of Justice and related national security institutions. We recognize that legitimate investigations of intelligence officials are both lawful and necessary when supported by evidence and conducted in accordance with ordinary principles of prosecutorial independence. Accountability strengthens democratic institutions. Political retaliation destroys them. The distinction between those two categories is therefore not merely important—it is foundational to constitutional government.

*Amicus'* experience overseas teaches that authoritarian systems frequently preserve the outward forms of legality while abandoning its substance. Courts continue to operate. Prosecutors continue to file indictments. Intelligence agencies continue to function. Elections may even continue to occur. What changes is the object toward which these institutions are directed.

Instead of protecting the Constitution, they increasingly protect the executive. Instead of investigating threats to the nation, they investigate perceived threats to the political leadership. The transformation is often gradual, but once professional independence is replaced by political loyalty, the damage to democratic governance becomes extraordinarily difficult to reverse.

  (d) *Danger to the Republic from the abuse of law enforcement powers to enable the authoritarian capture of intelligence agencies.*

19

Jackson's observations remain directly applicable here.  Constitutional safeguards exist not merely to prevent unlawful convictions, but to prevent the conversion of prosecutorial discretion into an instrument of political intimidation.  Where intelligence officers reasonably conclude that adherence to law, professional ethics or objective intelligence analysis may expose them to retaliatory investigation, prosecution or public ruin, the resulting chilling effect extends throughout the Intelligence Community.  Independent analysis gives way to anticipated political preference.  Objective intelligence becomes increasingly difficult to produce.  The Executive Branch loses the professional independence upon which sound national security decision-making depends.

Steady State members respectfully submit that this Court should evaluate claims of retaliatory prosecution against Plaintiff with this broader institutional context in mind.  Our collective experience observing democratic backsliding abroad confirms that the politicization of prosecutorial authority against intelligence and security professionals is not an isolated personnel matter.  It is among the recognized indicators of authoritarian consolidation.  Justice Jackson warned against precisely this danger, both as the principal architect of the *Youngstown* concurrence and, years earlier, as Attorney General reminding federal prosecutors that their highest obligation is not to secure convictions, nor to satisfy the desires of those in power, but to do justice.  That principle remains one of the Constitution's most important safeguards against the conversion of lawful authority into arbitrary power.

Plainly stated, Defendants are attempting to misuse federal law enforcement to suppress political dissent by making a public example of criminally investigating Plaintiff, and thereby muzzle uncomfortable but needed discussion of issues such as foreign interference in U.S. elections, and any current counterintelligence vulnerabilities of Defendant Trump regarding

20

Putin and Russia. Defendants' efforts to retaliate against and silence Plaintiff, and other current and former public officials, are a flashing-red warning sign of authoritarianism. Their grave misconduct ought to be exposed as such, by granting Plaintiff's petition.

## CONCLUSION

This Court should grant Plaintiff's request for injunctive relief, or writs under 28 U.S.C. §§ 1361 or 1651 requiring the government to preserve communications relevant to possible future criminal charges.  Granting the relief requested by Plaintiff, pre-indictment, is of course extraordinary.  However, as District Judge Williams said in *Trump v. IRS*, "There is nothing 'ordinary' about this case."[48]  The same is true here, and Plaintiff deserves the requested relief.[49]

Dated: July 22, 2026

Respectfully submitted,

Kevin Thomas Carroll
DC Bar No. 1021479
Partner, Mark S. Zaid, PC
1250 Connecticut Avenue, NW, Suite 700
Washington, DC 20036
718-791-5761

*Counsel for The Steady State*

---

[48]  2026 U.S. Dist. LEXIS 154806 *4 (S.D.Fla. Jul. 13, 2026).

[49]  Further to F.R.A.P. 29(a)(4)(e), neither Plaintiff, his counsel nor anyone other than The Steady State authored or funded this brief.

22